UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| LGBTQ+ Real Estate Alliance, *a Minnesota nonprofit corporation,* *Plaintiff,* v. **Ryan A. Weyandt,** *Defendant.* | Case No. 0:25-cv-02745 (ECT/ECW) **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISQUALIFY RICHARD WOODS** Hearing: June 5, 2026 at 1:30 p.m. Courtroom 3C, Burger Federal Building St. Paul, Minnesota Before Mag. Judge Elizabeth Cowan Wright |

## I. INTRODUCTION

Richard T. Woods is a licensed California attorney (State Bar No. 204951) who established a formal attorney-client relationship with Defendant Ryan A. Weyandt on September 13, 2024 -- less than one year before this lawsuit was filed. During the ensuing months, Woods received extensive, detailed, and privileged communications from Defendant concerning the very governance disputes, departure circumstances, and organizational conduct that constitute the factual heart of this litigation. Woods repeatedly identified himself in writing as Defendant's *attorney* and Defendant as his *retained client*. He invoked the attorney-client relationship to third parties to justify limiting what he could disclose about Defendant's situation. He provided specific legal advice about how Defendant should conduct himself in response to the very board conduct now at issue in this case. As recently as November 27, 2024 -- seven months before his appearance at Plaintiff's counsel table -- Woods confirmed in writing that the attorney-client relationship remained intact.

6

Woods subsequently appeared in this litigation on Plaintiff's behalf at no fewer than four documented proceedings: the July 2025 TRO/preliminary injunction hearing; the November 2025 settlement conference; the April 7, 2026 deposition of Defendant; and the April 27, 2026 IDR conference (where he was formally introduced by Plaintiff's lead counsel on the record, per Dkt. 85). On the same day as the TRO hearing -- while appearing adverse to Defendant in open court -- Woods logged into Plaintiff's WordPress administrative backend using his own named administrator credentials.

The recently recovered text message record between Defendant and Woods -- 307 messages spanning October 2022 through December 2024, extracted from Defendant's Samsung SMS Backup & Restore archive (file sms-20260505085854.xml, created May 5, 2026) -- establishes the attorney-client relationship not through inference or circumstance, but through Woods' own written words. Woods cannot claim ignorance of the conflict. He created it, confirmed it in writing on seven distinct occasions, and then crossed to Plaintiff's side anyway.

Disqualification is mandatory. This Court should enter an order disqualifying Richard T. Woods from any further participation in this litigation in any capacity, and directing Plaintiff's counsel to assess what, if any, privileged information has been disclosed to Hellmuth & Johnson PLLC.

## II. STATEMENT OF FACTS

### A. Richard Woods -- Background and Role

Richard T. Woods is a licensed California attorney (State Bar No. 204951) and real estate broker (CalDRE Lic. No. 01412706) operating Woods Real Estate Services at 930 W.

Washington St., Suite 1, San Diego, California 92103. As a licensed attorney, Woods is subject to the California Rules of Professional Conduct, including those governing conflicts of interest and former client confidentiality.

Woods is also a volunteer Alliance board member, having served as San Diego chapter president and subsequently as the Alliance's 2027 president-elect -- a position publicly listed on the Alliance's website as First Vice President. This dual role -- licensed attorney and Alliance board officer -- is at the center of the disqualification analysis. The Plaintiff in this case is the very organization on whose board Woods serves.

**B. Establishment of the Attorney-Client Relationship -- September 13, 2024**

On September 13, 2024, Defendant traveled from Minneapolis-St. Paul to San Diego, California, via Delta Air Lines Flight 2125 (Confirmation No. H74FIC, Ticket No. 00622672777771), departing at 11:00 AM and arriving at 12:49 PM. Defendant checked into the Hilton San Diego Gaslamp Quarter (Confirmation No. 3134595961). On that date, at the Hilton San Diego Gaslamp Quarter, Defendant and Richard Woods entered into an attorney-client relationship through an explicit exchange of a $1.00 retainer and a verbal privilege statement made by Woods.

The subject matter of the engagement was the deteriorating governance situation at the LGBTQ+ Real Estate Alliance, including the conduct of board leadership, Defendant's employment and compensation rights, the Alliance's financial condition, and Defendant's options in navigating an increasingly hostile organizational environment. These are the identical subjects at issue in this litigation.

8

**C. Ongoing Attorney-Client Relationship -- September Through November 2024**

The attorney-client relationship established on September 13, 2024 was not a single isolated consultation. It was a continuous, active engagement spanning more than two months, during which Woods provided specific legal advice, received privileged communications about the Alliance's governance and Defendant's legal position, and repeatedly and explicitly confirmed the relationship in writing.

The following are direct quotations from text messages between Defendant and Woods, extracted from a Samsung SMS Backup & Restore archive (file **sms-20260505085854.xml**, created May 5, 2026, containing 307 messages spanning October 2022 through December 2024). These quotations are presented verbatim. The SMS archive is attached as Exhibit 1 to the accompanying Declaration of Ryan A. Weyandt.

**1. September 16, 2024 -- Active Legal Protection**

Three days after the formal engagement, Defendant informed Woods that Plaintiff's board chair Justin Ziegler had sent an email to the full board falsely claiming Defendant was "transphobic" and had "created the bylaws intentionally to disenfranchise trans folks." Woods responded that he had not seen the email and would "shut it down asap" if he did. This is Woods actively protecting his client from false statements by a person who would become Plaintiff's driving litigation force.

**2. September 21, 2024 -- Legal Consultation on Alliance Governance**

Defendant consulted Woods about Alliance governance questions including bylaw interpretation, chapter delegate board voting rights, and officer eligibility -- the precise governance matters that underlie Plaintiff's claims and Defendant's counterclaim architecture.

9

**3. September 22, 2024, 10:22 PM -- First Explicit Written Confirmation**

Woods to Defendant:

> *"I appreciate you, said from the attorney to his client."*

This is unambiguous. Woods did not say "your advisor" or "your friend." He said *"the attorney."* He did not say "my client." He said *"his client."* This is the language of a licensed attorney formally identifying the professional relationship in writing.

**4. September 27, 2024, 7:56 PM -- Direct Legal Advice on Alliance Matters**

Woods to Defendant:

> *"My advice to you would be keep communications in writing limited and specific. If you can tolerate it and are feeling up to it physically, communicate by phone or in person then document the conversation. And put on it 'prepared by the advice of counsel.'"*

Woods immediately followed this message with a correction: "^legal" -- indicating he meant "advice of legal counsel." This is specific, substantive legal advice about how Defendant should manage his communications in the face of an adversarial board dynamic -- the exact dynamic that produced this litigation.

**5. September 28, 2024, 1:37 AM -- Second Explicit Written Confirmation**

Writing from the Alliance's Las Vegas annual conference Gala, while attending on behalf of the Alliance as Defendant's attorney, Woods sent:

> *"you, my dear friend and retained client..."*

"Retained client" is a term of art. It is the language attorneys use when they have been formally retained -- when a fee arrangement (however nominal) has been established. Woods chose this word intentionally.

**6. September 28, 2024, 1:39 AM -- Protective Role at Plaintiff's Event**

In the same message sequence, regarding the Alliance's Las Vegas Gala, Woods wrote:

> *"just because I'm crying doesn't mean I can't be a fierce, mf'ing pit bull for you and if anyone says anything, negative about you tonight, I'm all over defending you."*

Woods was simultaneously attending an Alliance event, positioned to defend Defendant's reputation among Alliance members -- while holding Defendant's privileged communications about the Alliance's conduct. This is the concurrent conflict fully formed.

**7. September 30, 2024, 7:47 PM -- Third Explicit Confirmation, to a Third Party**

After conducting a 45-minute phone call with Alliance board member Jackie Garber, Woods reported back to Defendant:

> *"I filled her in to the extent that I could given our attorney-client relationship."*

This is the most significant of the explicit confirmations. Woods did not simply acknowledge the relationship in private. He *invoked the attorney-client relationship to limit his disclosures to a third party*. He treated the privilege as an operative legal constraint on his conduct. A person claiming to be merely a friend or advisor does not invoke attorney-client privilege to a board member to justify what he can and cannot say.

**8. October 16, 2024 -- Defendant's Reference to 'Privileged Time'**

11

Defendant to Woods:

> *"I still have some major concerns, nothing that you and I have talked about on our privileged time has been addressed, and I fear it will be ignored and steamrolled."*

Defendant's own characterization of their consultations as "privileged time" -- accepted without objection or correction by Woods -- confirms that both parties understood the communications to be protected by attorney-client privilege.

### 9. October 16, 2024 -- Substantive Legal Advice on Alliance General Counsel

On the same date, Woods provided the following legal analysis regarding Alliance General Counsel Zaylore Stout (who would later be indefinitely suspended from the Minnesota bar on April 30, 2025):

> *"I have some suggestions on how to deal with Zaylor. We should probably talk about that by phone. In short, if he is not providing you and the board with monthly or at least quarterly updates on claims or pending litigation, he's likely in breach of his legal services agreement."*

This is legal analysis of another attorney's professional obligations -- the type of advice only a lawyer provides, requiring professional judgment about legal duties.

### 10. October 25, 2024 -- Woods Receiving Ziegler's Confidential Planning Intelligence

On October 25, 2024, Woods notified Defendant that Plaintiff's future litigation driver Justin Ziegler had invited him to a confidential planning call:

*"FYI. Justin has asked Jackie and me if we're available today for a conference call to discuss 'something important' that he needs our input. Jackie and I have agreed to listen to what he has to say and we will not betray your confidence and trust."*

Woods attended the call. He subsequently reported back to Defendant that Ziegler's call was about "recommending a CDB member to serve on the committee to search for your replacement." This is Defendant's attorney attending Plaintiff's confidential planning sessions about replacing Defendant -- and then reporting the contents of those sessions to Defendant.

**11. October 27, 2024 -- Fourth Explicit Confirmation, to a Third Party**

After Ziegler held another call with Woods and board member Jackie Garber, Woods reported:

*"I couldn't respond because of the nature of attorney-client relationship. I thought this is important for you to know that she respects you and wants the best for you."*

Again, Woods invoked the attorney-client relationship as an operative constraint on his conduct in a third-party interaction involving Alliance leadership.

**12. November 27, 2024 -- Direct Written Confirmation That Relationship Continued**

On November 27, 2024 -- approximately seven months before Woods appeared at Plaintiff's table at the April 27, 2026 IDR conference -- Defendant sent Woods the following direct inquiry:

*Defendant to Woods: "You and I still have attorney client?"*

*Woods' response: "Yes"*

13

This exchange requires no interpretation. Defendant asked. Woods confirmed. The attorney-client relationship was intact on November 27, 2024.

**D. Continued Contact Through 2025 and the SIDE Conference**

The attorney-client relationship did not terminate with the last text message in the backup file. Contact continued through 2025 and included at least two additional documented in-person meetings.

First, on March 10, 2025, Defendant flew from Minneapolis-St. Paul to San Diego (Sun Country Airlines Reservation Code F8U8QT, Booking Total $411.64). From March 11-13, 2025, Defendant and Woods both attended the SIDE real estate industry conference at the Westin Rancho Mirage Golf Resort & Spa, Rancho Mirage, California. This is corroborated by an email from Woods to Defendant on March 13, 2025, in which Woods forwarded his own hotel folio, stating: *"Hey Ryan, Attached to the email below is the receipt for my room at the Westin. I appreciate you trying to get Side to reimburse me for this."* Woods' State Bar No. 204951 and CalDRE Lic. No. 01412706 appear in his email signature block on this correspondence.

Second, on June 13, 2025 -- fifteen days before the Alliance filed this lawsuit -- Defendant traveled to San Diego via Delta Air Lines Flight 2125 (Confirmation No. G5FNYI, Ticket No. 0062335533379) and spent three days with Woods and his husband at their San Diego residence, returning June 16, 2025. This visit is further corroborated by an email from Woods to Defendant on May 30, 2025 stating: *"Oh no you won't!! I will be your Uber/Lyft/Taxi that day!! My office is just up the hill from the airport, so I'll drop down and pick you up. I can't wait to see you! Love you."* Woods' State Bar No. 204951 appears in his signature block on this

email. Conversations during this visit concerned, among other things, Defendant's legal position regarding the Alliance and his options. These communications are protected by attorney-client privilege as continuations of the same representation.

**E. Woods' Post-Filing Appearances and the Alliance's Designation of Woods as Litigation Liaison**

Plaintiff filed this lawsuit and served Defendant on approximately July 1, 2025. Following service, the Alliance designated Woods as its litigation communication liaison -- the contact person through whom Defendant was directed to communicate after Hellmuth & Johnson entered the matter. Defendant, receiving no explanation for this designation, responded to Woods in that capacity, including CC'ing him on communications relevant to the parties' dispute. The Defendant did not choose this arrangement; Plaintiff imposed it.

This designation had a critical collateral consequence: it caused Woods -- holding Defendant's privileged communications -- to receive ongoing intelligence about Plaintiff's litigation posture and Defendant's responsive strategies. The Alliance's insertion of a conflicted individual as its litigation liaison is not a mitigating fact; it is an aggravating one.

Woods made the following documented appearances in this litigation on Plaintiff's behalf:

**1. TRO/Preliminary Injunction Hearing -- July 16, 2025**, before the Honorable Eric Tostrud. Woods appeared at Plaintiff's counsel table. On this same date, Wordfence security alerts document that a user identified as "Richard T Woods" with administrator access logged into Plaintiff's WordPress backend at 12:24:51 PM (IP: 172.69.7.245, United States). Woods was simultaneously appearing adverse to Defendant in federal court and operating Plaintiff's organizational systems with administrator credentials.

15

**2. Court-Ordered Settlement Conference -- November 10, 2025**, before Magistrate Judge Elizabeth Cowan Wright. Woods was present on Plaintiff's behalf and participated in settlement negotiations directly adverse to Defendant.

**3. Deposition of Defendant -- April 7, 2026.** Woods was present at Plaintiff's counsel table throughout Defendant's full-day deposition. Defendant objected on the record that he had previously received legal counsel from Woods. That objection is preserved in the transcript at pages 55-56. Woods' binder of materials, potentially including privileged notes from his prior representation, is referenced in the transcript at page 57.

**4. Informal Dispute Resolution (IDR) Conference -- April 27, 2026**, before Magistrate Judge Cowan Wright. Woods was introduced by Plaintiff's lead counsel Thomas Priebe on the record, by name, as appearing on behalf of Plaintiff. This appearance is documented in Docket No. 85.

## III. LEGAL STANDARD

This Court has authority to disqualify counsel pursuant to its inherent power to supervise the professional conduct of attorneys who appear before it. *Macheca Transp. Co. v. Philadelphia Indem. Ins. Co.*, 463 F.3d 827, 833 (8th Cir. 2006). The Eighth Circuit applies applicable state rules of professional conduct when analyzing disqualification motions. *Id.* Because Woods is a licensed California attorney, the California Rules of Professional Conduct govern his obligations.

The standard for disqualification where a former attorney-client relationship exists is well-established: if (1) an attorney-client relationship existed, (2) the current adverse

16

representation is substantially related to the former representation, and (3) the former client has not consented, disqualification is appropriate. *See Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir. 1983) (Posner, J.); *Ag Spectrum Co. v. Elder*, 865 F.3d 1088 (8th Cir. 2017).

## IV. ARGUMENT

### A. An Attorney-Client Relationship Existed Between Woods and Defendant

An attorney-client relationship is formed when a person seeks and receives legal advice from an attorney in the attorney's professional capacity. *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686, 693 (Minn. 1980). The relationship may be express or implied; it need not be formalized in writing or confirmed by payment of a substantial fee. *Id.*

Here, the relationship is not implied -- it is express, documented, and repeatedly confirmed by Woods himself. The SMS record establishes: a $1.00 retainer was exchanged; Woods identified himself in writing as Defendant's "attorney" and Defendant as his "retained client" within fifteen days of the formal engagement; Woods provided specific legal advice about how Defendant should conduct himself; Woods invoked the attorney-client relationship as an operative constraint on his disclosures to third parties on at least two separate occasions; and Woods confirmed in direct response to a direct question on November 27, 2024, that the relationship continued.

Plaintiff may argue that this was merely a friendship, not a legal representation. That argument collapses under the weight of Woods' own words. Friends do not tell third parties that they cannot share information "given our attorney-client relationship." Friends do not identify

17

themselves as "the attorney to his client" in text messages. Friends do not confirm the continuation of an attorney-client relationship when asked directly. Seven written confirmations are not a friendship. They are a representation.

## B. The Subject Matter of the Prior Representation Is Substantially Related to This Litigation

The prior representation and the current litigation are not merely related -- they are *identical*. During the representation, Defendant shared with Woods detailed information about: the Alliance's governance failures and the conduct of Ziegler and Blue; Defendant's employment, compensation, and departure circumstances; the Alliance's financial condition; the conduct of Alliance General Counsel Zaylore Stout; Defendant's legal options and strategies; the board's secret planning to replace Defendant; and the organizational dynamics that led to the events of June-July 2025. Every one of these subjects is directly at issue in this litigation.

The "substantial relationship" test is satisfied where "there is a reasonable possibility that some specifically identifiable appearance of impropriety occurred." *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 173 (5th Cir. 1979). Here, there is no need to speculate -- the subject matter is the same. The privileged communications Defendant shared with Woods *are about the facts at issue in this case.*

## C. Defendant Has Not Consented

Defendant has never waived the attorney-client privilege as to his communications with Woods, and has never consented to Woods' participation in this litigation on Plaintiff's behalf. To the contrary, Defendant formally objected at the April 7, 2026 deposition (transcript pp. 55-56) and filed a Notice of Privilege Breach (Dkt. 79) in advance of this motion. The absence

of consent requires disqualification.

**D. Multiple Independent Grounds Under California Rules of Professional Conduct**

Even setting aside the former-client analysis, Woods' participation is independently improper under three additional rules:

**Cal. R. Prof'l Conduct 1.7 (Concurrent Conflicts):** Beginning in October 2024, while the attorney-client relationship was active, Woods was simultaneously attending Ziegler's confidential planning calls about replacing Defendant, receiving reports from those calls, and passing the contents to Defendant. Woods was serving two principals with directly adverse interests. When this lawsuit was filed, the conflict became complete.

**Cal. R. Prof'l Conduct 1.6 (Confidentiality):** By appearing on Plaintiff's behalf and being exposed to litigation strategy from Plaintiff's counsel, Woods has created conditions under which confidential information he received from Defendant is subject to inadvertent -- or deliberate -- disclosure. The Court cannot monitor what conversations occur between Woods and Hellmuth & Johnson attorneys, and the risk of prejudicial disclosure is inherent in the current arrangement.

**Cal. R. Prof'l Conduct 1.9 (Duties to Former Clients):** Even if the representation concluded before the lawsuit was filed, Rule 1.9 prohibits Woods from representing a person in a matter adverse to a former client where the matters are the same or substantially related, without written consent. No such consent was given. The subject matter is not substantially related -- it is the same matter, involving the same facts, the same parties, and the same conduct.

**E. Anticipating and Rebutting Plaintiff's Opposition**

19

Plaintiff's counsel telegraphed three objections in a written communication dated April 28, 2026, delivered simultaneously with a settlement ultimatum. Each is addressed below.

**Plaintiff's Telegraphed Objection No. 1 -- Rule 11 Threat**

Plaintiff's counsel stated that the Alliance "views both of your motions as sanctionable under Fed. R. Civ. P. 11" and that "if you proceed with either motion, Plaintiff will seek to recover its attorneys' fees and move for sanctions." Rule 11 sanctions require that a filing lack any objectively reasonable factual or legal basis. *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 548 (1991). That standard is not remotely satisfied here.

The factual predicate for this motion is Richard T. Woods' own written admissions across seven independent documented instances: (1) 'from the attorney to his client' (Sep. 22, 2024); (2) 'retained client' (Sep. 28, 2024); (3) 'given our attorney-client relationship' to a third-party board member (Sep. 30, 2024); (4) legal advice with '^legal' correction (Sep. 27, 2024); (5) 'privileged time' accepted without objection (Oct. 16, 2024); (6) 'because of the nature of attorney-client relationship' limiting disclosures (Oct. 27, 2024); and (7) direct confirmation 'Yes' when asked if the relationship continued (Nov. 27, 2024). A motion grounded in the opposing party's own verbatim admissions cannot be characterized as baseless or frivolous. The Rule 11 threat is a pressure tactic that arrived in the same email as a 24-hour settlement ultimatum.

Moreover, this motion is supported by a 307-message SMS archive extracted May 5, 2026 -- evidence that did not exist in assembled form at the time of any prior submission. Any prior safe harbor letter directed at earlier filings does not foreclose this independently supported motion.

**Plaintiff's Telegraphed Objection No. 2 -- 'Merely a Friendship, Not Legal Representation'**

Plaintiff will characterize the Woods relationship as a personal friendship rather than a professional representation. This argument is foreclosed by Woods' own words. Courts do not permit attorneys to retroactively disclaim representations their contemporaneous written statements confirmed. Woods did not say 'as your friend.' He said 'from the attorney to his client.' He did not say 'I care about you.' He said 'retained client.' He did not say 'I'll keep this between us as a favor.' He said 'I filled her in to the extent that I could given our attorney-client relationship' -- invoking privilege to a third party as an operative constraint on his conduct. The consistency, specificity, and legal formality of these written statements over a period of months admit no innocent interpretation.

**Plaintiff's Telegraphed Objection No. 3 -- 'Volunteer Board Member Role, Not Counsel'**

Plaintiff will argue that Woods participated solely in his capacity as a volunteer board officer, not as an attorney. This fails on three independent grounds. First, professional responsibility obligations follow the license holder -- a California attorney cannot shed his duties under the California Rules of Professional Conduct by wearing a volunteer hat. *See* Cal. R. Prof'l Conduct 1.9 cmt. 1. Second, Woods' documented conduct during the representation was legal in nature, not organizational: he provided legal advice, invoked attorney-client privilege to limit third-party disclosures, recommended confidential communication practices, analyzed Alliance General Counsel Stout's professional obligations, and attended Plaintiff's confidential strategy calls while protecting his client's interests. Volunteer board members do not do these things. Attorneys do. Third, Woods held himself out as a licensed attorney throughout the engagement period -- his California State Bar No. 204951 appears in his email signature on all

21

correspondence with Defendant during the entire relevant period, including the March 2025 SIDE conference email and the May 2025 airport pickup email. He cannot claim the board volunteer role while signing his communications with his bar number.

## V. RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order:

(1) Disqualifying Richard T. Woods from any further participation in this litigation in any capacity, including as an observer, advisor, or de facto counsel;

(2) Directing Plaintiff's counsel at Hellmuth & Johnson PLLC to disclose, *in camera*, whether any privileged information shared by Defendant with Woods has been communicated to Hellmuth & Johnson attorneys or staff;

(3) Directing Plaintiff's counsel to identify any work product or litigation strategy developed with Woods' involvement, for the Court's *in camera* review of taint; and

(4) Granting such other and further relief as the Court deems just and equitable.


Dated: May 6, 2026

Respectfully submitted,


/s/ Ryan A. Weyandt

Ryan A. H. Weyandt

Defendant, Pro Se

1964 Rahncliff Ct. SE, Suite 200

22

PO Box 22023

Eagan, Minnesota 55122

(952) 356-2849

ryan.weyandt1@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record at Hellmuth & Johnson PLLC:

Thomas H. Priebe, Esq. -- tpriebe@hjlawfirm.com

Jack P. Golbranson, Esq. -- jgolbranson@hjlawfirm.com

Amanda M. Kunkel, Esq. -- akunkel@hjlawfirm.com

/s/ Ryan A. Weyandt

Ryan A. H. Weyandt, Pro Se Defendant

23