**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| LGBTQ+ Real Estate Alliance, a Minnesota non-profit company, | Case No.:0:25-cv-02745 (ECT/ECW) |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO FILE COUNTERCLAIMS** |
| vs. | |
| Ryan Weyandt, | |
| Defendant. | |

## INTRODUCTION

Defendant Ryan Weyandt's ("Defendant") Motion for Leave to File Counterclaims (Dkt. 88[1]) ("Motion") should be denied outright as it is another belated and meritless filing brought to harass, cause unnecessary delay, and needlessly increase the cost of litigation.

Plaintiff LGBTQ+ Real Estate Alliance ("Alliance") commenced this action on July 1, 2025. Over the past 10+ months, Alliance has diligently conducted discovery and prepared this case for a final resolution through dispositive motion practice and/or trial – which is set for October 2026. Defendant, on the other hand, did not conduct any discovery or timely assert counterclaims. Instead, Defendant chose to make unfounded accusations and file baseless motions in an effort to transform this case into something it is not (i.e. a

---

[1] As explained further below, Defendant filed a second Motion for Leave to File Counterclaims on May 8, 2026. (Dkt. 97-105). This opposition addresses both motions, including the six (6) counterclaims in Defendant's first filing on May 6, 2026, and the additional fourteen (14) proposed counterclaims in his second filing. (Dkt. 103).

legal challenge to Alliance's operations/governance) and otherwise delay and needlessly increase the cost of this litigation at every step.

Overlooking the fact the Defendant does not have good cause to extend the deadlines to amend the pleadings or complete discovery, the counterclaims he seeks to assert are meritless and futile. Of Defendant's initial six (6) proposed counterclaims, five are barred outright by Defendants' employment contract with Alliance and the remaining one fails based on the applicable statute of limitation.

As explained further below, Defendants' Motion should be denied because there are no extraordinary circumstances, good cause does not exist, and each of his counterclaims claims are futile.

**RELEVANT FACTS**

Defendant has presented no evidence that could actually support his assertions and he failed to provide proper citations for his purported "Factual Background." This is likely because his proposed counterclaims are baseless and devoid of legitimate factual support.

## I.    ALLIANCE'S FOUNDING, BUSINESS MODEL, AND GROWTH.

Alliance was formed in 2020 as a 501(c)(6) non-profit member organization dedicated to empowering the LGBTQ+ community in the real estate market. (Dkt. 11, ¶ 5). In 2020, with the assistance of others, Defendant alleges that he filed paperwork and bylaws with the Minnesota Secretary of State and opened an account with the Minnesota Department of Revenue. (Priebe Decl., Ex. A, Deposition Transcript of Ryan A. Weyandt (hereinafter "Weyandt Depo."), pp. 21-23).

Alliance maintains chapters throughout the United States and connects potential LGBTQ+ homeowners with LGBTQ+ real estate professionals, including agents, lenders, banks, and title companies. (Dkt. 11, ¶ 5). Among other things, Alliance maintains a newsletter that operates as the key point of contact and information hub for Alliance and its community. (*Id.,* ¶ 6). Alliance also works with other aligned organizations to advocate for equal and fair housing for the LGTBQ+ community and other marginalized groups. (*Id.,* ¶ 7).

Alliance's newsletter recipients ("Customer List") includes over 10,000 LGBTQ+ and industry influencers, corporate executives, association executives, leaders, agents, professionals, potential buyers and sellers, and other key industry contacts and customers. (*Id.,* ¶ 8). Alliance primarily generates revenue through the Customer List. (*Id.,* ¶ 11; Weyandt Depo. at 258:8-16 and 259:2-10).

From late 2020 or early 2021 to December 3, 2024, Defendant served as Alliance's CEO. (Dkt. 11, ¶ 13). Alliance and Defendant negotiated an employment contract for Defendants' role as CEO. (Weyandt Depo.: 37:9-38:14; Priebe Decl. Ex. D). After several back-and-forth negotiations between Alliance's counsel and Defendant's personal counsel,[2] Defendant eventually executed an employment agreement on February 3, 2021 ("Employment Agreement"). (*Id.,* Ex. D).[3]

---

[2] (Weyandt Depo.: 35:25-36:14).

[3] The Employment Agreement "is something that [Defendant] negotiated with an attorney… and signed it [which] reflect[s] that [he understood] and agreed to the terms." (Weyandt Depo.: 46:14-20).

## II.    DEFENDANT'S PERFORMANCE ISSUES AND VOLUNTARY RESIGNATION FROM ALLIANCE.

On October 23, 2023, due to Defendant's continued poor performance as CEO, Alliance placed Defendant on a performance improvement plan ("PIP"). (Priebe Decl., Ex. E). The PIP was issued by Alliance's Board of Directors ("Board") and outlined numerous ways in which Defendant's performance as CEO was deficient and problematic, including: (i) Defendant often missed key events; (ii) Defendant delayed tasks and events by not following set deadlines; (iii) Defendant took unexpected and unplanned time off work; (iv) Defendant failed to show up to meetings and failed to promptly inform meeting attendees of his absence; (v) Defendant often took "2-4 weeks to respond to emails, even from Board members;" (vi) Alliance's partners expressed frustration to the Board regarding having to work with Defendant; and (vii) other, similar issues. (*Id.*)

Defendant remained subject to the PIP through late 2024. (Weyandt Depo.: 119:10-120:17). In 2024, Defendant resigned from Alliance. (See *Infra*). A few examples of Defendant confirming his resignation are set forth below.

In October 2024, Defendant prepared and delivered an update to the Board. (Weyandt Depo.: 122:21-124:6). Pursuant to the October 2024 update, Defendant sought to form a new "committee for the executive search." (Priebe Decl., Ex. F). Defendant sought to form a new committee tasked with finding a new executive because he, as Alliance's CEO, was planning his resignation. (*Id.*) (See also Weyandt Depo.: 125:13-19) (**Q:** "[The Board was] looking for your replacement, and that was necessary because you had indicated that you were going to be stepping down as CEO, right? **A:** Eventually, yes.")

4

On or around December 5, 2024, Alliance held its fourth Quarterly Board Meeting for 2024. (Priebe Decl., Ex. G). The meeting minutes state: "**Ryan re-confirmed his resignation from the September Board Meeting**," that "[h]e would make himself available for the President/Interim-CEO," that he "requests a 45-day leave of absence," and that he "left the meeting shortly after." (*Id.*) (emphasis added).

On December 6, 2024, Alliance and Defendant began drafting a public statement to announce Defendant's resignation. (Dkt. 19-1). Alliance emailed the draft statement to Defendant, noting "please find the revised statement, **<u>incorporating Ryan's edits</u>.**" (*Id.*) (emphasis added). The statement began: "**I am writing to you today to announce that Ryan Weyandt – our founding CEO – has decided to resign his position with our organization to tend to personal matters and to take time to explore the next chapter of his professional journey.**" (*Id.*) (emphasis added). Defendant responded that same day: "**This is well written as I expected**." (*Id.*) (emphasis added). Defendant continued: "Justin, as you move forward through these times, I encourage you to utilize the full title of your role '2025 National President and Chair of the Board' – this would be a perfect opportunity to start." (*Id.*). In other words, the day after "re-confirm[ing] his resignation" in a Board meeting (Priebe Decl., Ex. G), Defendant helped draft, edited, and approved a public announcement regarding his voluntary resignation from Alliance. (Dkt. 19-1).

On December 11, 2024, Defendant texted Richard Woods, the First Vice President and President-Elect at Alliance, "Today is third of a voluntary 45-day personal leave, **at the end of which my voluntary resignation will be submitted and implemented**." (Priebe Decl., Ex. H) (emphasis added). Defendant continued, "I've left Mary Mancera as

the interim CEO, and hopefully she can hold things over until the board… hires my replacement." (*Id.*). In less than one week, Defendant "re-confirmed his resignation" in a Board meeting (*Id.*, Ex. G), revised and approved a public announcement regarding his resignation from Alliance (Dkt. 19-1), and notified Alliance's President-Elect that he was "voluntary[ily] resign[ing]." (Priebe Decl., Ex. H).

On December 29, 2024, Alliance announced Defendant's resignation to third parties. (Priebe Decl., Ex. I). Defendant received notice of Alliance's announcement regarding his resignation that same day, but he did not object or otherwise inform Alliance that he did not resign. (*Id.*). Instead of objecting or even responding to Alliance's public notice of his resignation, Defendant posted on Facebook and confirmed that he had made the decision to resign: "**In early December I chose to step away from [Alliance] to invest time into personal growth, health, and family**. This time has granted me clarity and perspective and I'm grateful for it. It's been an amazing ride; **I now conclusively can say that my time steering the ship must be passed on, in order to make way for new leadership to carry the torch into the future.**" (Dkt. 19-2) (emphasis added).[4]

If there were any doubt regarding Defendant's voluntary resignation, it is removed by his admission on the record at the July 16, 2025 hearing on Plaintiff's Motion for a Preliminary Injunction, that "he had resigned his position with Alliance…" (Dkt. 25, p. 1).

---

[4] While this Facebook post authored by Defendant was derived from a news article, Defendant has since deleted his Facebook account and claims there is no way to verify whether he actually wrote this. (Weyandt Depo.: 176:1-7). At the same time, however, Defendant does not deny that the message was authored by him, and testified that it "sounds like something [he would] say." (*Id.*, 177:1-8).

### III.   DEFENDANT'S UNLAWFUL ACTIONS AFTER HE RESIGNED.

After Defendant's voluntary resignation, Alliance made several attempts to transition the Alliance Accounts from Defendant to Alliance. (Dkt. 11, ¶ 17; Priebe Decl., Ex. J). Several employees and directors of Alliance requested that Defendant return Alliance's accounts back to Alliance's control. (*Id.*) Despite repeated promises to transition the accounts, Defendant failed to cooperate. (*Id.*).

On June 25 and 26, 2025, Defendant, among other things: (1) unlawfully took control of Alliance's e-mail server and Customer List and e-mailed Alliance's entire Customer List that he was taking "emergency fiduciary oversight of [Alliance]" because "Alliance is currently in a state of collapse;" (2) deactivated several of Alliance's employees and directors' accounts, (3) threatened to take adverse action to Alliance utilizing Alliance's Accounts, and (4) edited and removed key information from Alliance's website. (Dkt. 11, ¶ 19; Dkt. 11-2; Weyandt Depo.: 224:25-225:7).

After Defendant engaged in these unlawful acts, Alliance immediately commenced suit and filed a Motion for Temporary Restraining Order and Preliminary Injunction ("Alliance's TRO"), which this Court granted. (Dkt. 25).

### IV.   PROCEDURAL POSTURE AND DEFENDANT'S BAD FAITH.

Alliance commenced suit on July 1, 2025 (Dkt. 1), and immediately moved for a preliminary injunction and temporary restraining order (Dkts. 6-11). The parties initially stipulated to an agreement on the record (Dkt. 22), but after Defendant failed to comply

with the terms of the parties' stipulation and was incarcerated for a period of time on felony charges,[5] the Court granted Alliance's TRO on July 24, 2025. (Dkt. 25).

Between July 24, 2025 and present, Alliance amended its complaint and engaged in discovery to prepare its case for dispositive motion practice and/or trial. While Alliance diligently prepared its case, Defendant filed baseless motion after baseless motion to try to delay this matter as long as possible and needlessly increase Alliance's attorneys' fees. A few examples of Defendants' bad faith tactics and filings include: (1) a motion to amend and/or supplement the record (Dkt. 33), which was denied (Dkt. 39); (2) a motion for protective order (Dkt. 43), which was rejected (Dkt. 45); (3) a motion for "clarification" (Dkt. 43), which was rejected (Dkt. 45); (4) a meritless motion for sanctions (Dkt. 43), which was rejected (Dkt. 45); (5) a motion for "subpoena authority" (Dkt. 43), which was rejected (Dkt. 45); (6) a "Notice" of privilege breach and conflicts (Dkt. 79), which was stricken (Dkt. 84); (7) the parties attended an IDR hearing regarding Defendants' second request to extend the discovery deadline, which was denied (Dkt. 85); and (8) Defendant recently filed a total of four (4) different motions, two (2) of which were filed after May 6, 2026 (Dkts. 87-105).

In January 2026, after not engaging in *any* discovery, Defendant filed a motion to stay discovery pending his sentencing hearing in the Criminal Action. (Dkt. 68). This Court granted Defendant's motion in part, giving him an extension to respond to Alliance's discovery and appear for his deposition. (Dkt. 75). Despite the Court's Order advising

---

[5] *State of Minnesota v. Ryan Anthony Weyandt*, 19HA-CR-25-1373 ("Criminal Action").

Defendant that he needed to "show that he has acted with the requisite diligence in complying with the deadlines [….] so as to warrant an extension" to the discovery deadline in the future (Dkt. 75, p. 8), Defendant did not serve any discovery requests on Alliance until it was too late (Dkt. 85).

In April 2026, Defendant noticed his intent to file a *second* motion to extend the discovery deadline, which the parties ultimately submitted to the Court per its informal dispute resolution ("IDR") process. (Dkt. 82). The Court denied Defendant's request for an extension of the fact discovery deadline "because Defendant has not shown good cause for the extension" and granted Alliance's related motion for a protective order (Dkt. 85). Despite the Court's denial of Defendant's previous good cause argument, he has now filed this Motion, again arguing "good cause" exists for his belated request to assert counterclaims and extend discovery. (*See e.g.* Dkt. 88, pp. 7-9, 19).

Shortly after filing this Motion, Defendant posted an article on "Substack" regarding this litigation, and his recent filings. (Priebe Decl., Ex. M). In his post, Defendant compared this Motion to a tsunami, stating: "it isn't just one waive. The first one makes landfall and people start to breathe again. They emerge… Then the second wave comes. Larger than the first. Then the third. Larger than the second." (*Id.*) Defendant goes on to compare the "federal courtroom" to a "theater," and says that he intends to continue to filing motions, like this one, because he has "nothing left to lose." (*Id.*) While much of it is difficult to make sense of, Defendant's recent online post shows that his primary motivation in this

9

case is retaliation and makes it clear that Defendant will continue his bad faith tactics and try to delay a final resolution for as long as he can. (*Id.*[6])

## ARGUMENT

### I.   THE COURT SHOULD CONSIDER ONLY THE PROPOSED COUNTERCLAIMS SET FORTH IN DEFENDANT'S FIRST FILINGS.

Defendant has once again unnecessarily complicated this case and the present motions by filing two sets of "motion" documents on different dates. With respect to his Motion here (for counterclaims), Defendant's first filing on May 6, 2026 sought leave to assert six (6) counterclaims. (Dkt. 88) The next day, the Court asked Defendant to resend the accompanying proposed order as an attachment. Rather than sending the proposed order, Defendant decide to instead file a *completely different motion* – seeking leave to assert twenty (20) counterclaims – on May 8, 2026. (See Dkt. 97-105).

This Court should summarily reject Defendant's second filing as it is in violation of the Pretrial Scheduling Order (Dkt. 65), Local Rule 7.1, and Fed. R. Civ. P. 8 (see below) and 11.[7] Alliance also respectfully requests that the Court award Alliance is attorneys' fees

---

[6] For example, Defendant's post encourages "anyone and everyone to read" his Motion(s), which he claims are "not the opening move" or "even close to the most consequential one at play." Defendant also threatens "those in leadership" that "the road ahead does not have an exit," and says his Motions are "a methodically executed, multi-front, multi-year accountability campaign conducted by someone with nothing left to lose who is, nonetheless, executing with the discipline and precision of someone with everything to gain."

[7] Among other things, Defendant has not attempted to meet and confer on the twenty (20) Counterclaims and does not have a right to change his motion days after first filing it, leaving Alliance without knowing if its deadline to respond is 7 days from May 6 or May 8. (Priebe Decl., Ex. K).

under Local Rule 1.3. In any event, this response will focus primarily on the six (6) counterclaims Defendant's first motion requested leave to assert. (Dkt. 88).

## II.    LEGAL STANDARD TO MODIFY A SCHEDULING ORDER AND STAY DISCOVERY.

Under the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Rule 15 allows for the liberal amendment to pleadings, "parties do not have an absolute right to amend their pleadings." *Sherman v. Winco Fireworks, Inc*., 532 F.3d 709, 715 (8th Cir. 2008). Motions to amend are properly denied if "there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Id*. (citations omitted).

When a party, like Defendant here, seeks to amend <u>after the deadline</u> provided in a court's pretrial scheduling order, Federal Rule of Civil Procedure 16 applies, not Rule 15. *Id.* at 715-716; see also *In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437–38 (8th Cir. 1999) ("If we only considered Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively [abrogate] Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.").

Under Federal Rule 16(b)(4), a movant must establish "good cause" and receive the "judge's consent" to modify the scheduling order. Additionally, to amend a scheduling order under Local Rule 16.3, the moving party must obtain a hearing date on their motion

11

"before the passing of [the] deadline that [the] party moves to modify," "except in extraordinary circumstances." L.R. 16.3(d); *Coleman v. Minneapolis Pub. Schs.*, No. 18-cv 2283 (DSD/ECW), 2020 WL 6042394, at \*4-5 (D. Minn. Oct. 13, 2020) (Defendant must show "the 'extraordinary circumstances' required under Local Rule 16.3(d) to excuse the fact that he" is seeking modification of the deadlines after they have already passed).

Accordingly, for Defendant to prevail on this motion, he must show extraordinary circumstances <u>and</u> establish good cause.

### III.    DEFENDANT'S MOTION SHOULD BE DENIED BASED ON HIS POSITION THAT THE COUNTERCLAIMS WERE COMPULSORY UNDER RULE 13(a).

Alliance's claims are based on the unlawful actions that Defendant took <u>after</u> his resignation – when he no longer had any affiliation with Alliance, let alone authority. (Dkt. 69). However, Alliance takes no position on Defendant's argument that his counterclaims are compulsory under Fed. R. Civ. P. 13(a) at this time. Based on Defendant's contention, he was required to assert the counterclaims in his Answer to Alliance's Complaint or in his Answer to Alliance's Amended Complaint. *Id*. He never did. Under Supreme Court precedent, Defendant's counterclaims are "barred." *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 1 (1974) ("a counterclaim which is compulsory but is not brought is thereafter barred.")

In addition, Defendant's own factual assertions show that he was aware of the alleged circumstances claimed to give rise to his counterclaims before Alliance filed suit or shortly thereafter. Fed. R. Civ. P. 13(e). This means Defendant's assertion that the

evidence "was not fully assembled until the conclusion of fact discovery" is false and his alleged counterclaims matured before his pleadings. (*Id*.; Dkt. 88, p. 5).

## IV. NO EXTRAORDINARY CIRCUMSTANCES ARE PRESENT AND GOOD CAUSE DOES NOT EXIST.

Defendant's failure to assert his counterclaims when required and decision to bring several baseless motions instead of pursue discovery fall egregiously short of "the 'extraordinary circumstances' required under Local Rule 16.3(d) to excuse the fact" that he is seeking" modification of the deadlines after they have already passed.[8] *Coleman*, 2020 WL 6042394, at *8. Defendant has further failed to identify or argue any facts that he believes might amount to the "extraordinary circumstances" required to modify deadlines at this late stage. On this alone, Defendant's Motion should be denied because there is nothing in the record to support any "extraordinary circumstance" sufficient to support his motion.

Additionally, for the reasons set forth below, "good cause" does not exist to entertain Defendant's request to bring untimely and meritless counterclaims.

### a. Defendant's Undue Delay and Failure to Act Diligently.

Under Rule 16(b)(4), "when a litigant has a reasonable opportunity to develop an issue within the deadlines established by the pretrial scheduling order, the litigant's failure to do so demonstrates lack of diligence regardless of whether the failure resulted from a tactical decision or neglect." *Kelley v. BMO Harris Bank N.A.,* No. 19-CV-1756 (WMW),

---

[8] Defendant is seeking to extend the deadline to amend pleadings **and** the deadline for discovery. *See* Dkt. 88, pp. 9, 19.

2022 WL 1771999, *7 (D. Minn. June 1, 2022), citing *Albright v. Mountain Home Sch. Dist.*, 926 F.3d 942, 951 (8th Cir. 2019) and *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 759-60 (8th Cir. 2006) (observing that the plaintiff had "ample opportunity to develop her expert testimony on the causation issue" and her "tactical decision" as to this issue did not demonstrate good cause to amend the pretrial scheduling order).

The following "facts" set forth by Defendant himself demonstrate his lack of diligence because they show he had knowledge of these potential counterclaims, but failed to diligently assert them. First, Defendant states: "Weyandt's own retained employment counsel, during pre-litigation negotiations, received confirmation from Alliance counsel Zaylore Stout -- then acting on behalf of the Alliance -- that the board had made "a conscious decision" to reduce Weyandt's compensation" (Dkt. 88, p. 4). Based on this assertion, Defendant admits that he had knowledge of his potential counterclaims against Alliance since *at least* July 2025, which was well before the time he answered the Complaint and the Amended Complaint. Despite having knowledge of these potential counterclaims for at least ten (10) months, Defendant did nothing. Second, Defendant states: "Pre-litigation negotiations conducted by Weyandt's counsel confirmed that the Alliance acknowledged the existence of a severance obligation but declined to fulfill it." (Dkt. 88, pp. 4-5). Again, Defendant acknowledges that he was aware of these potential counterclaims "pre-litigation" (*i.e.,* 10 months ago), but did nothing.

Additionally, Defendant states that his deposition "confirmed the factual predicates for each counterclaim, and in some instances, produced admissions supporting them. Prior to deposition, Weyandt lacked the procedural record needed to plead these claims…" (Dkt.

99, p. 2). Contrary to his argument, only Defendant testified at his deposition, so any "admissions" that supposedly "confirmed the factual predicates for each counterclaim" could only have been made by Defendant. Defendant also argues that a "sworn affidavit of Rebecca A. Judd (dated July 15, 2025)" allegedly supports his counterclaims. (Dkt. 99, p. 2). This deserves particular scrutiny because Defendant did not produce this affidavit during discovery, despite ostensibly having possession of it since July 2025. Finally, Defendant argues that "Document production" supports his counterclaims and that "these facts were developed through discovery and deposition." (Dkt. 99, p. 2). However, *Defendant has not conducted any discovery in this case.* (Dkt. 85). Defendant's argument supports one of two conclusions -- either Defendant has taken third-party discovery without Alliance's knowledge (which is addressed below) or Defendant believes that his own document production supports his counterclaims, in which case he was required to assert the counterclaims months ago.

Either way, Defendant's Motion makes one thing abundantly clear: he had knowledge of his alleged counterclaims for *at least* ten (10) months, but failed to act diligently. Due to Defendant's lack of diligence, his Motion should be denied.

### b. *Defendant's Bad Faith and Dilatory Tactics.*

Defendant's bad faith is clearly demonstrated in the online post he published on May 9, 2026 (Ex. M). In addition, Defendant argues that his motion should be granted based on information he discovered via "third-party subpoena responses from Heartland Payroll and ADP." (Dkt. 88, pp. 6, 8). Defendant failed to provide notice of these subpoenas and failed to produce any of the information he allegedly collected. Fed. R. Civ.

P. 45(a)(4). Alliance was clearly prejudiced by this failure as it was without an opportunity to object to such subpoenas. *See* Fed. R. Civ. P. 45(d)(1). Defendant's failure to provide notice of this third-party discovery evinces his bad faith and dilatory motive. As explained further below, the failure to provide notice also supports an award of Alliance's attorneys' fees.

### c. Defendant's Continued Failure to Comply with Court Rules Supports Denying his Motion.

Defendant has failed to comply with this Court's Rules since the onset of this case, including the several examples set forth above in Fact Section IV.

In addition to his multitude of baseless filings, violations of the applicable Rules, and recent online publication, Defendant has also filed contradictory sworn declarations. For example, in the Criminal Action, Defendant filed a sworn declaration that states his Criminal Action and this case "involve[e] the same events." (*See* Court File: 19HA-CR-25-1373, at Index #32, #33, and #35).[9] This sworn statement is in direct conflict with Defendant's sworn declarations in this case. (*See e.g.* Dkt. 27, p. 3 ("The pending legal matter referenced by Plaintiff is *entirely unrelated* to this case and remains unadjudicated") (emphasis added); Dkt. 43-12, p. 2). Filing false declarations is clearly a violation of the

---

[9] In his Criminal Action filings, Defendant also accuses Alliance of planting evidence and "coordinat[ing] with police to initiate [the] criminal charges." Court File: 19HA-CR-25-1373, at Index #32. Overlooking the falsity of Defendant's accusations, they indicate that retaliation is his true motivation for asserting baseless arguments, bringing frivolous and untimely motions, and otherwise refusing to end this litigation by simply acknowledging that he has no authority to speak or act on behalf of Alliance. *See also* Ex. M.

Federal Rules of Civil Procedure and this Court's Local Rules. *See e.g.* Fed R. Civ. P. 11 and L.R. 1.3.

### d. Alliance will be Prejudiced if Defendant is Permitted to Belatedly Assert (frivolous) Counterclaims.

"When deciding whether a party has demonstrated good cause to amend a pretrial scheduling order, a court's analysis under Rule 16(b)(4) focuses almost exclusively on the moving party's diligence." *Kelley v. BMO Harris Bank N.A.,* No. 19-CV-1756 (WMW), 2022 WL 1771999, *6 (D. Minn. June 1, 2022). "**A court need not address the prejudice factor, however, if the record clearly demonstrates that the moving party did not exercise sufficient diligence.**" *Id.* (emphasis added). That said, Courts have found sufficient prejudice exists to defeat a motion to modify the pretrial scheduling order when the proposed modification would result in delay and additional expense to the nonmovant. *Fair Isaac Corp. v. Fed. Ins. Co.,* No. 16-CV-1054 (WMW/DTS), 2022 WL 1537957, *6 (D. Minn. May 16, 2022) (denying motion to modify because "granting [Defendant's] motion to modify the pretrial scheduling order would prejudice [Defendant] by imposing unwarranted delay and expense…")

Pursuant to the Scheduling Order, discovery closed on April 22, 2026, the deadline to amend pleadings closed on January 22, 2026, the non-dispositive motion deadline was May 6, 2026, and trial is set to begin on October 19, 2026. (Dkt. 65). Despite these clear and mutually agreed to deadlines, Defendant filed this Motion, requesting leave to file 6 (and later, 20) counterclaims. If Defendant's Motion is granted and he is permitted to bring *any* of these counterclaims, the entire scheduling order will need to be modified, and this

case will basically go back to square one. Among other things, the parties will have to restart discovery, motion deadlines will need to be reset, and trial will need to continued.[10] Any such delay – which, again, would be attributable *solely* to Defendant's lack of diligence – will undoubtedly cause severe prejudice to Alliance. *Fair Isaac Corp.,* No. 16-CV-1054 (WMW/DTS), 2022 WL 1537957, *6 (Prejudice exists if there is an "unwarranted delay.")

If this Motion is granted, Alliance will be required to incur substantial expenses in re-litigating this entire case, as it will need to move to dismiss the (baseless) counterclaims and, if the counterclaims are not dismissed at the outset, Alliance would be forced to answer them, serve additional written discovery, re-depose Defendant, depose third-parties, prepare relevant motions, and prepare for a (likely) several week-long trial, rather than the currently scheduled, three-day trial. In short, Defendant's lack of diligence will cause substantial prejudice against Alliance by virtue of the vast expenses Alliance will undoubtedly incur. *Id.* (Prejudice exists if there is an "unwarranted …expense.")

On a related point and as previously explained,[11] Alliance will be prejudiced the longer this case continues. Alliance is ready, and should be allowed, to proceed with summary judgment to put an end to Defendant's disingenuous denials of clear fact, efforts

---

[10] Given his past tactics, Alliance suspects that one of Defendant's goals in bringing this Motion is to delay a final decision in this case. As Alliance previously explained to the Court, Defendant appears to be using this civil case as leverage in his Criminal Action, and vice versa. (*See* Dkt. 85).

[11] *See e.g.* Dkt. 82 and 85.

to distract and hide from reality, irrelevant accusations, defamation, and attempts to needlessly prolong this case.[12]

### e. *Defendant's Motion Must Be Denied Because his Counterclaims are futile.*

Defendant's Motion can and should be denied for the reasons above. Regardless, the Motion must denied because each of Defendant's purported counterclaims are futile.

"When a party challenges a proposed amendment on futility grounds, the Court considers whether the amendment could withstand a Rule 12(b)(6) motion to dismiss." *Modern Point, LLC v. ACU Development, LLC*, 2020 WL 13032696 at *6 (D. Minn. Oct. 22, 2020) citing *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Id*. (citation and internal quotations omitted).

Here, the allegations set forth in Defendant's Proposed Counterclaims (Dkt. 88, pp. 11-17; Dkt. 103) do not provide the information required to state any plausible claims, lack merit, and would be dismissed on a Rule 12 motion.

The counterclaims Defendant initially sought leave to assert[13] largely overlap and are: (Count I) Breach of Employment Contract – Unauthorized Wage Reduction; (Count

---

[12] Despite the Court having already issued an Order prohibiting Defendant from "hold[ing] himself out as having authority to act or speak on behalf of Plaintiff LGBTQ+ Real Estate Alliance," he continues to do so. *See* Ex. M (Defendant suggests his Motion(s) are for "[t]he one-time nearly 4,000 members of the LGBTQ+ Real Estate Alliance…")

[13] This section largely addresses only Defendant's first filing on May 6, 2026 (Dkt. 88). Section V below briefly addresses the futility of the additional fourteen (14) counterclaims set forth in Defendant's subsequent filing on May 8, 2026 (Dkt. 103).

II) Breach of Employment Contract – Failure to Pay Severance; (Count III) Breach of Implied Covenant of Good Faith and Fair Dealing; (Count IV) Unjust Enrichment; (Count V) Violation of Minn. Stat. § 181.01 et. seq.; and (Count VI) Conversion and Wrongful Withholding of Employee Records.

### i. Count I, Count II, and Count V[14] of the Counterclaim are futile based on the Employment Agreement's plain language.

The first two causes of action (Counts I and II) in Defendant's proposed counterclaim are both based on allegations that Alliance breached Defendant's Executive Employment Agreement (the "Employment Agreement") by failing to pay his full wages and severance. (Dkt. 88, pp. 13-14 at ¶¶15-24). The fifth cause of action (Count V) seeks the same "wages, severance, and compensation" based on an alleged violation of Minn. Stat. § 181.01, et seq. (*Id.*, pp. 15-16 at ¶¶35-38).

All three causes of action are meritless based on the Employment Agreement's plain language. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792-93 (8th Cir. 2014) (Affirming Rule 12 dismissal for failure to state a claim under agreement's plain language).

Defendant's Count I is premised on a demonstrably false assertion that the Employment Contract "provided for a base salary of $135,000[15] per year and could not be

---

[14] The original Count V is Count IV in Defendant's second, improper and untimely filing (Dkt. 103, p. 6).

[15] The Employment Agreement was not "last executed in 2023," as Defendant claims. (Dkt. 88, p. 12 ¶7). It was executed in 2021 and reflected a 2021 salary of $115,000 (not $135,000). (Priebe Decl., Ex. D, at Schedule 1; *see also* Weyandt Depo. pp. 37-38) (Defendant testified that this 2021 Employment Contract was "the only employment agreement [he] signed during [his] time at Alliance")).

amended except by written instrument signed by both parties." (Dkt. 88, p. 13 at ¶16). This allegation is untrue – the Employment Contract unambiguously states the following with respect to Defendant's compensation: "The Company may adjust the Base Salary from time to time **in its sole discretion**, subject to the approval of the Board of Directors." (Priebe Decl., Ex. D[16]) (emphasis added). In turn, Defendant's claim that "Alliance unilaterally reduced Weyandt's compensation without a written amendment and without his consent, in direct breach of the Agreement's terms" is baseless. (Dkt. 88, p. 13 at ¶17).

As for Count II, Defendant falsely alleges that he was entitled to "four months of severance" under the Employment contract. (Dkt. 88, p. 14 at ¶¶21-22). Once again, under the Employment Agreement's plain language, because Defendant voluntarily resigned, he was not entitled to any severance. (Priebe Decl., Ex. D, at §10.03) ("Executive **will not be entitled to severance pay** if the Executive voluntarily resigns from their position") (emphasis added). While Defendant will object that he resigned, the record of his resignation is clear:

- In October 2024, Defendant prepared and delivered an update to the Board. (Weyandt Depo.: 122:21-124:6). Pursuant to the October 2024 update, Defendant sought to form a new "committee for the executive search" to search of Defendant's replacement. (Priebe Decl., Ex. F).

- Alliance's December 6, 2024 Board meeting minutes state: "**Ryan re-confirmed his resignation from the September Board Meeting**," that "[h]e would make himself available for the President/Interim-CEO," that he "requests a 45-day leave of absence," and that he "left the meeting shortly after." (Priebe Decl., Ex. G) (emphasis added).

---

[16] Schedule 1 of the Employment Agreement makes this clear by stating "**All compensation and benefits are subject to the terms of the relevant plan documents, which may be amended or terminated at any time upon action by the Board of Directors**." (*Id.*, p. 12) (emphasis in original).

- Alliance and Defendant jointly drafted a statement regarding Defendant's resignation. (Dkt. 19-1).

- Defendant confirmed that after his leave in 2024, his "**voluntary resignation will be submitted and implemented**." (Priebe Decl., Ex. H)

- On December 29, 2024, Alliance announced Defendant's resignation to third parties. (Priebe Decl., Ex. I). Defendant received a copy but did not object.

- In late December 2024 or early January 2025, Defendant posted on Facebook and confirmed that he had made the decision to resign: "**In early December I chose to step away from [Alliance] to invest time into personal growth, health, and family.**" (Dkt. 19-2)

- During the July 16, 2025 hearing on Alliance's TRO, Defendant, on the record, "agreed that he had resigned his position with Alliance…" (Dkt. 25, p. 1).

Next, Count V is futile because Alliance did not breach the Employment Agreement (as explained above), and Alliance did not "demand or receive from [Defendant] any rebate or refund from the wages owed the [Defendant] under contract of employment…" Minn. Stat. § 181.03, subd. 1. If there could be any doubt this claim were meritless, Defendant specifically acknowledged receiving his "final pay" in February of 2025. (Priebe Decl., Ex. L); *Karlen v. Jones Lang LaSalle Americas, Inc.*, 766 F.3d 863, 867-68 (8th Cir. 2014) (Holding that Minn. Stat. § 181.03 "does not determine *what* an employer owes" so to recover under the statute, "the employee must establish an independent substantive legal right, separate and distinct from [§§ 181.03 and 181.13] to the particular wage claimed.") (citation omitted).

### ii. Count III of the Counterclaim is futile because there is no implied covenant of good faith and fair dealing in employment contracts.[17]

This cause of action is futile because "the Minnesota Supreme Court has squarely held that there is no implied covenant of good faith and fair dealing in Minnesota employment contracts." *Poff v. Western Nat. Mut. Ins. Co.*, 13 F.3d 1189, 1191 (8th Cir. 1994). Despite this well-settled law, Defendant's Count III is premised entirely on the false assertion that "Minnesota law implies a covenant of good faith and fair dealing into every employment contract." (Dkt. 88, p. 14, at ¶26).

Even overlooking the fact that Minnesota does not recognize this claim in the employment context, Count III would still be futile because "a cause of action for breach of the duty of good faith and fair dealing cannot exist independent of an underlying breach of contract claim." *H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1419 (D. Minn. 1993). Specifically, this Count III would still be futile because it is an independent tort claim based on alleged "bad faith" breaches of the Employment Contract that Alliance did not breach (see above). *Id.*; *Int'l Travel Arrangers v. NWA, Inc.*, 723 F. Supp. 141, 152-53 (D. Minn. 1989). Moreover, even if Alliance did breach (it did not), this claim would still be futile because there are no allegations that Alliance made it impossible for Defendant to perform under the Employment Contract. *Id.* at 1420 ("There can be

---

[17] While the proposed counterclaims do not allege a "wrongful termination," Defendant's argument suggests this Count III does include such a claim. (Dkt. 88, pp. 1, 14). Out of an abundance of caution, it should be noted that such a claim would also be futile because "Minnesota does not recognize a general common law claim for wrongful discharge…" *Thompson v. Campbell*, 845 F.Supp. 665, 676 (D. Minn. 1994); *citing Steinbach v. Northwestern Nat'l Life Ins. Co.*, 728 F.Supp. 1389, 1394 (D. Minn. 1989).

no breach of the implied duty of good faith and fair dealing under Minnesota law unless a party's actions make it impossible for the other party to perform the contract.")

### iii.   Count IV of the Counterclaim is futile because unjust enrichment is unavailable where a valid contract exists.

Under Count IV, Defendant asserts a claim for unjust enrichment based on the alleged benefit he conferred on Alliance during his time as CEO and Alliance's alleged failure to pay him "the agreed contract rate." (Dkt. 88, p. 15 at ¶¶ 31-34). This cause of action is futile as a matter of law because "equitable relief cannot be granted where the rights of the parties are governed by a valid contract" and Defendant admits that the Employment Contract "constituted a valid, binding contract…" *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981); *Stuart v. Global Tel\*Link Corp.*, 956 F.3d 555, 562-63 (8th Cir. 2020); Dkt. 88, p. 13 at ¶15; *see also Rouse v. H.B. Fuller Co.*, 694 F.Supp.3d 1149, 1163 (D. Minn. 2023).

### iv.   Defendant's Counterclaim for Conversion and Wrongful Withholding of Employee Records (Count VI) is futile for several reasons, including the one-year limitations period.

This cause of action is presumably based on Minn. Stat. § 181.961, which provides employees a right to request and obtain their personnel records. (Dkt. 88, p. 16 at ¶ 42) (alleging "Minnesota law entitles employees to access their own personnel and payroll records"). This claim is futile, as a matter of law, for at least three reasons.

First, since Defendant never made a "written request" for his personnel file under the statute, Alliance was not required to provide Defendant with a copy of his personnel

24

file. Minn. Stat. § 181.961, subds. 1 and 2 (An "employer shall comply with a written request pursuant to subdivision 1 no later than seven working days after receipt…")

Second, this cause of action is time-barred. Minn. Stat. § 181.965, subd. 2 ("Any civil action maintained by the employee under this section [181.960-181.964] must be commenced within one year of the actual or constructive discovery of the alleged violation").

Third, Defendant specifically "agreed to work with Alliance to return exclusive control **of all accounts** that were the subject of the motion to Alliance." (Dkt. 25) (emphasis added). The "accounts" subject to Alliance's motion specifically included the Heartland payroll account that Defendant now alleges he has a "legal right of access to." (Dkt. 88, p. 16 at ¶ 40). In other words, overlooking the fact that Defendant had no right to access "the Hartland payroll platform" after his resignation, Alliance could not have "wrongfully withheld" this information because Defendant specifically agreed to return "exclusive control" over that account back to Alliance.

## V.    THE ADDITIONAL FOURTEEN (14) COUNTERCLAIMS IN DEFENDANT'S BELATED AND IMPROPER SECOND MOTION ARE FUTILE "KITCHEN-SINK" PLEADINGS.

To the extent Defendant's belated second Motion seeks leave to assert twenty (20) counterclaims, it should be immediately denied because it violates Rules 8 and 11 of the Federal Rules of Civil Procedure. *See, e.g.*, *Gurman v. Metro Hous. & Redevelopment. Auth.*, 842 F. Supp. 2d 1151, 1153, 1153 n.2 (D. Minn. 2011) (collecting cases). The proposed counterclaims (Dkt. 103) are a classic example of an impermissible "kitchen-sink" or "shotgun" pleading that attempts to "brings every conceivable claim against every

25

conceivable" party. *Id.*[18] Defendant's recent online publication makes it abundantly clear that he is impermissibly using his proposed counterclaims as a "press release." *Reynolds v. Harper*, 2026 WL 622283 at *11 (D. Minn. March 5, 2026); Ex. M ("I am actively encouraging anyone and everyone to read the record" including his current Motion).

The Defendant has "essentially coughed up an unsightly hairball of factual and legal allegations, stepped to the side, and invited the [Alliance] and the Court to pick through the mess and determine if [Defendant] may have pleaded a viable claim or two." *Id.*, at 1153. "This is emphatically not the job of either a defendant or the Court. It is the [Defendant's] burden, under both Rule 8 and Rule 11, to reasonably investigate [his] claims, to research the relevant law, to plead only viable claims, and to plead those claims concisely and clearly, so that [Alliance] can readily respond to them and a court can readily resolve them." *Id.* at pp. 1153-54.

### a. *Defendant's Additional Fourteen (14) Counterclaims Are Frivolous.*

Since Defendant's belated Motion should be summarily rejected, the frivolity of a few of his 14 additional counterclaims will be briefly addressed here.[19]

Count VII alleges Alliance is liable for conversion and unjust enrichment for using Defendant's alleged intellectual property by virtue of the domain LGBTQplushomes.com,

---

[18] Practically speaking, it appears Defendant is making this motion as a sort of "shoulders-shrugged, 'you asked for it' approach" after the Court denied his last motion to extend discovery deadline. *Quinlan v. Puls,* 2025 WL 1616471 at *5-6 (D. Minn. April 7, 2025).

[19] Like the Court in *Gurman*, "[b]y singling out some of [Defendant's] claims for comment in this [memorandum], the [Alliance] does not mean to suggest that [Defendant's] other claims are nonfrivolous." *Id.*, at 1155. No matter which filing is considered, Defendant's purported counterclaims are all baseless and futile as a matter of law.

and needs to pay for, or be enjoined from using, the same. (Dkt. 103, p. 7 at ¶¶ 42-43; Priebe Decl., Ex. D, at §11.04 and Ex. B). This claim is futile because Defendant already agreed that Alliance was the "lawful owner of" LGBTQplushomes.com, and he was enjoined (temporarily, for now) from accessing, misappropriating, and otherwise using that domain. (Dkt. 25). Additionally, Defendant cannot bring an unjust enrichment claim because the "rights of the parties are governed by a valid contract." *See Stuart v. Global Tel\*Link Corp.*, 956 F.3d at 562-63. Moreover, conversion cannot apply because Alliance did not (and Defendant has not claimed) "willfully interfere" with any property rights of Defendant, or deprive Defendant of a property interest permanently or for an indefinite period of time. *See Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003); *Hansen v. Santander Bank, N.A.*, 689 F.Supp.3d 679, 692 (D.Minn. 2023) ("To constitute conversion, interference must be either permanent or must last 'for an indefinite length of time.") (citation omitted).

Count VIII alleges Alliance's officer and directors breached fiduciary duties in various ways. (Dkt. 103, p. 7 at ¶¶ 45-47). To the extent this is a derivative claim, it is futile because Defendant has no standing to assert claims on behalf of Alliance. *Id*. (alleging the fiduciary duties were owed to "Alliance as a corporation"); c.f. *Basich v. Bd. Of Pensions of the Evangelical Church in Am.,* 493 N.W.2d 293, 295 (Minn. Ct. App.1992) (Holding non-members of a nonprofit "had no standing to bring a derivative suit"); *see also* Fed. R. 23.1. To the extent Defendant claims fiduciary duties owed to him personally were breached, they are also futile because Defendant was an employee, not a member or officer.

27

*Harris v. Madan Business Systems*, Inc., 421 N.W.2d 350, 353 (Minn. Ct. App. 1988); *Brennan v. Chestnut*, 973 F.2d 644, 648 (8th Cir. 1992); Minn. Stat. § 317A.361.

Count IX claims "retaliatory adverse action" and "abuse of process" based on an allegation that Defendant relayed some "ethics complaints" back in 2024. (Dkt. 103, p. 8 at ¶¶ 48-51). This claim is futile because the allegedly adverse action – a performance improvement plan (PIP) – was issued in 2023, one year before his alleged report in 2024. (Priebe Decl., Ex. E). This means, there cannot be a causal connection between the alleged report and adverse action.[20] Further, "placement of an employee on a PIP does not, by itself, constitute an adverse employment action." *Henry v. Indep. School Dist.* #625, 988 N.W.2d 868, 890 (Minn. 2023). Regardless, Defendant resigned from his employment, and he cannot and has not claimed facts that could support a "constructive discharge." *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) ("[W]e have consistently recognized that an employee is not constructively discharged if [he] quits without giving [his] employer a reasonable chance to work out a problem").

In Count X, Defendant claims Alliance tortiously interfered with his prospective economic advantage. (Dkt. 103, p. 8 at ¶¶ 53-54). This claim fails because he has not alleged (and cannot show) any of the required elements for tortious interference, including that Alliance intentionally interfered with any expectation of economic advantage, let alone that such interference was "independently tortious or in violation of a state or federal statute

---

[20] To have a prima facie case of retaliation Defendant would need to establish that his allegedly protected conduct motivated Alliance's decision to issue the PIP. *See e.g. Eliserio v. United Steelworkers of Am. Local 310*, 389 F.3d 1071, 1078-79 (8th Cir. 2005).

or regulation." *CPI Card Group., Inc. v. Dwyer*, 294 F.Supp.3d 791, 823 (D. Minn. 2018). Defendant's suggestion that "the filing of this litigation" could support his claim here is preposterous. *Matthis v. Kennedy*, 67 N.W.2d 413, 417 (Minn. 1954) ("[W]ith certain recognized exceptions, [even] defamatory matter published in the due course of a judicial proceeding **is absolutely privileged and will not support a civil action** for defamation although made maliciously and with knowledge of its falsehood"[21]) (emphasis added).

Count XI alleges that Alliance is liable for defamation per se because it stated that "Weyandt resigned in January 2024, gained unauthorized access to Alliance systems, and sent an unapproved email," and otherwise set forth certain allegations in its Amended Complaint. (Dkt. 103, p. 8 at ¶¶ 56-58). This claim is futile because Defendant himself admitted he resigned (Dkt. 25), he failed to specifically plead defamation, and based on the absolute privilege that is applied to statements made during judicial proceedings. *Matthis*, 67 N.W.2d at 417; *Bergh v. Zoelle*, No. 24-3054 (JRT/DLM) 2025 WL 1746904 at *3-6 (D. Minn. June 24, 2025)

Count XII (false light invasion of privacy) (Dkt. 103, ¶¶ 60-61) is futile because this is not a recognized claim in Minnesota. *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 236 (Minn. 1998)("[W]e decline to recognize the tort of false light publicity"); *Bergh v. Health*, 2025 WL 368845 at *9 (D. Minn. Feb. 3, 2025).

Count XIII (declaratory judgment) (Dkt. 103, ¶¶ 62-64) is futile because "Incorporators of nonprofit corporations lose all their significance once the corporation is

---

[21] Alliance did not publish any false statements, maliciously or otherwise.

created; they no longer have any control over the corporation or its affairs." *State v. N. Star Rsch. & Dev. Inst.,* 200 N.W.2d 410, 421 (Minn. 1972).

Count XIV (whistleblower claim) (Dkt. 103, ¶¶ 65-67) is futile because of the judicial proceeding privilege, and because Defendant is not entitled to whistleblower protection since he was not an "employee" at the time of his alleged "protected report." Minn. Stat. § 181.932, subd. 1 (Prohibits employers from retaliation or discriminating "against an employee").

Count XV (violation of Member Inspection Rights) (Dkt. 103, ¶¶ 68-69) is futile because Defendant is not a "member or director" and is not entitled to inspect Alliance's corporate documents. Minn. Stat. § 317A.461, subd. 1. Even if he were, and Defendant actually requested this information (he has not), Alliance could rightfully refuse Defendant's request because it would not be for a "proper purpose." *Id.*, subd. 2.

Count XVI (Dkt. 103, ¶¶ 70-73) and Count XVII (*Id.*, ¶¶ 74-79) are futile for the same reasons as Count XIV (181.932), and because Defendant failed to bring a civil claim or charge under Minn. Stat. § 363A.08 within one year. Minn. Stat § 363A.28, subd. 3.

Count XVIII (abuse of process) (Dkt. 103, ¶¶ 80-83) is futile because in an abuse of process claim, the primary question is "whether the process was used to accomplish an unlawful end for which it was not designed or intended, or to compel a party to do a collateral act which he is not legally required to do." *Dunham v. Roer,* 708 N.W.2d 552, 571 (Minn. Ct. App. 2006) (quotation omitted). "The bare allegation that respondent had some greater scheme is insufficient to establish a genuine issue of material fact concerning an unlawful end." *Id.* at 572. Here, Alliance had legitimate, lawful reasons for commencing

this action (*i.e.,* Defendant's misappropriation of Alliance's trade secrets, Defendant's theft, and Defendant's defamatory statements). Defendant's "bare allegation that [Alliance] had some greater scheme" is insufficient to state a claim as a matter of law. *Id.*

Count XIX (declaratory judgment) (Dkt. 103, ¶¶ 84-87) is futile because Alliance was permitted to "retroactively reinstate its corporate existence by filing a single annual registration." Minn. Stat. § 317A.827, subd. 2. Moreover, Defendant resigned, lacks standing to take any actions on Alliance's behalf, and has no right to challenge any actions taken by Alliance.

Count XX (civil conspiracy) (Dkt. 103, ¶¶ 88-94) is futile because, among other things, a conspiracy requires two or more people working together to accomplish (1) an unlawful purpose or (2) a lawful act by unlawful means. *Harding v. Ohio Cas. Ins. Co.,* 41 N.W.2d 818, 824 (Minn. 1950). It also requires an underlying tort. *D.A.B. v. Brown,* 570 N.W.2d 168, 172 (Minn. Ct. App. 1997). Because Defendant's alleged underlying torts fail (see *supra*), this claim fails too.

In sum, Defendant's Motion should be denied because: (i) there are no exceptional circumstances; (ii) good cause does not exist; (iii) Defendant's bad faith, lack of diligence, and delays; (iv) Alliance will suffer severe prejudice, and (v) Defendant's counterclaims are all futile.

## VI.    ALLIANCE IS ENTITLED TO ITS ATTORNEYS' FEES AND OTHER APPROPRIATE SANCTIONS.

The Court has the authority to award sanctions, including attorneys' fees, when a party acts in bad faith. *Dillon v. Nissan Motor Co.,* 986 F.2d 263, 267 (8th Cir. 1993) ("a

court may assess attorneys' fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons"), citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45 (1991); *see also Lord v. Nissan Motor Co.,* No. CIV.03-3218 PAM/JSM, 2004 WL 2905323, *2 (D. Minn. Dec. 13, 2004) ("The Court has discretion to impose sanctions under its inherent disciplinary power.") Recently, this Court explained:

> Within the courts' inherent authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases[,]" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)), is the power "to fashion an appropriate sanction for conduct which abuses the judicial process," *id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). For example, if a party acts in bad faith, the court may require that party "to reimburse legal fees and costs incurred by the other side." *Goodyear*, 581 U.S. at 107. However, because a court's inherent powers are "very poten[t]," courts should "exercise[ ] [them] with restraint and discretion." *Schlafly v. Eagle F.*, 970 F.3d 924, 936–37 (8th Cir. 2020) (quoting *Chambers*, 501 U.S. at 44–45). Any attorney's-fees sanction imposed by the court for bad-faith litigation conduct must be purely compensatory—it "may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Goodyear*, 581 U.S. at 108. Federal courts have discretion in determining whether to impose sanctions under their inherent power. *See Chambers*, 501 U.S. at 55 (reviewing the district court's imposition of sanctions under its inherent power for abuse of discretion); *Schlafly*, 970 F.3d at 937 (referring to the district court's "informed discretion").
>
> "[A]n award of attorneys' fees is permissible under a court's inherent powers as long as the person being sanctioned has demonstrated bad faith." *Willhite v. Collins*, 459 F.3d 866, 870 (8th Cir. 2006) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766–67 (1980)). Actions in litigation may constitute "bad faith" if a party "intentionally advanced a frivolous contention for an ulterior purpose, such as harassment or delay." *Actors' Equity Ass'n v. Am. Dinner Theatre Institute*, 802 F.2d 1038, 1043 (8th Cir. 1986).

*United States Sec. & Exch. Comm'n v. Carebourn Cap., L.P.,* No. 21-CV-2114 (KMM/JFD), 2026 WL 674209, *6-7 (D. Minn. Mar. 10, 2026); *see also* Local Rule 1.3.

32

Pro se parties are not immune to sanctions. *Bigalk v. Fed. Land Bank Ass'n of Rochester,* 107 F.R.D. 210, 213 (D. Minn. 1985) (sanctions apply to all parties, "including those acting pro se…"); *Kurkowski v. Volcker,* 819 F.2d 201, 203 (8th Cir. 1987) (granting sanctions against pro se party and explaining that "subjective 'good faith' (i.e. ignorance of the law or legal procedure) [does not] somehow excuse[] their actions.")

Here, Defendant should be sanctioned. His Motion is frivolous and unsupported by any fact or law for several reasons. For example, this Court denied Defendant's last motion to extend deadlines because Defendant failed to make a showing of good cause. (Dkt. 85). Approximately one week later, Defendant brought this Motion, which again requires a showing of good cause. In addition, Defendant initially filed a six (6) count proposed counterclaim as part of his Motion. (Dkt. 88). Two days later – and after the non-dispositive motion deadline had lapsed – Defendant re-filed a 20-count proposed counterclaim. (Dkt. 103). Further, Defendant has had knowledge of these alleged counterclaims for at least ten months, and in many cases, over the one-year statute of limitations. Despite having knowledge of his supposed claims, Defendant failed to act with diligence, and brought this motion *after* the pleading amendment deadline, *after* the non-dispositive motion deadline, and a mere five months before trial. Defendant's lack of diligence, continued filing of baseless motions, efforts to harass Alliance (and its representative), attempts to delay and needlessly increase the cost of this litigation, bad faith, and untimely "kitchen sink" Motion and proposed counterclaim should all be sanctioned.

Above all, sanctions should be awarded to deter Defendant from future baseless filings. *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643 (1976) (the

purpose of sanctions is "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.") As explained above (and previously), Defendant has filed numerous motions with this Court that have either been rejected or denied. (See e.g. Dkts. 33, 43, 68, and 79). After filing the present Motion(s), Defendant decided to post online about his recent filings, and described this Motion as follows:

- "This is a detonation notice. Filed publicly. Deliberately. Without apology."
- Defendant described this Court as a "theater."
- "The motion filed on May 6 is not the opening move."
- "We are now past the point where off-ramps exist. The vehicle is already in motion, and the road ahead does not have an exit."
- "This is a methodically executed, multi-front, multi-year accountability campaign conducted by someone with nothing left to lose…"
- Defendant compared this Motion to a tsunami, and concluded: "It isn't one wave. The first one makes landfall and people start to breathe again. They emerge. They assess. They think: maybe it's over. Maybe we can go back to the shore. They move forward. The water begins to look calm. Then the second wave comes. Larger than the first. Then the third. Larger than the second."

(Priebe Decl., Ex. M). In his online publications, Defendant continues to make his motives and intent crystal clear: he will continue bombarding the Court and Alliance with baseless filings and motions. As the United States Supreme Court has held, sanctions are appropriate to deter this exact type of conduct. *Nat'l Hockey League,* 427 U.S. at 643.

Finally, in his Motion, Defendant insinuated that he violated Federal Rule of Civil Procedure 45 by improperly subpoenaing third parties. Specifically, Defendant states: "[t]he evidentiary record supporting Weyandt's counterclaim was not fully assembled until… **[he received] third-party subpoena responses from Heartland Payroll and ADP**." (Dkt. 88, pp. 5-6) (emphasis added). Pro Se parties are not permitted to issue or

34

sign subpoenas. *Schrammen v. Conagra Foods Inc.,* No. 16-CV-2999 (WMW/SER), 2017 WL 517758, n. 2 (D. Minn. Feb. 8, 2017) ("Although an attorney as an officer of the court may issue and sign a subpoena, [plaintiff] is not permitted to do so as a pro se party"); see also Fed. R. Civ. P. 45(a)(3) (stating the clerk of the court and attorneys are authorized to issue subpoena). In fact, Defendant recognized that he lacked authority to do so. (Dkt. 43) (Defendant's "motion for subpoena authority.") Despite lacking authority, Defendant, in violation of Rule 45, ostensibly issued at least two subpoenas to "Heartland Payroll and ADP." (Dkt. 88, pp. 5-6).

Defendant's conduct throughout this litigation shows a complete disregard for the Court's Scheduling Order, Local Rules, and the Federal Rules of Civil Procedure. Rather than learning from his continued mistakes or ceasing to file baseless motions, Defendant continues to engage in the same frivolous conduct, which requires Alliance to incur legal fees and expenses in defending these incessant meritless filings. On top of that, Defendant publicly stated that his actions were "Deliberate," "without apology," and that this Motion was just the beginning. (Priebe Decl., Ex. M). Sanctions are appropriate to punish Defendant's past conduct, deter Defendant's future conduct, and show Defendant that the Court is not a "theater" for his continued baseless filings.[22]

---

[22] Alliance respectfully requests leave to file a motion for attorneys' fees within fourteen (14) days of an order on this Motion.

## CONCLUSION

For the foregoing reasons, Alliance respectfully requests that this Court deny Defendant's Motion and award sanctions to Alliance.

Respectfully submitted,

**HELLMUTH & JOHNSON, PLLC**

Dated: May 13, 2026

By: _/s/_ Thomas H. Priebe
    David G. Hellmuth, ID #0229131
    Thomas H. Priebe, ID #0395187
    John P. Golbranson, ID #0505663
    8050 West 78th Street
    Edina, MN  55439
    Telephone:  (952) 941-4005
    Facsimile:  (952) 941-2337
    E-mail: dhellmuth@hjlawfirm.com
    E-mail: tpriebe@hjlawfirm.com
    E-mail: jgolbranson@hjlawfirm.com
    **ATTORNEYS FOR PLAINTIFF**

10615889 – 38572.0001