

## EXECUTIVE EMPLOYMENT AGREEMENT

This **AGREEMENT** is dated and entered into as of this _____day of_____, 20_, by and between the LGBTQ+ Real Estate Alliance (the "Company") of PO Box 18491 West St. Paul, MN 55118-5511 and Ryan Weyandt (the "Executive")  of 1121 Smith Ave. S., St. Paul, MN 55118.

**WHEREAS**, this Agreement shall supersede, Amend and Restate the oral or written agreement in full such that any prior agreement will have no force or effect.

**NOW, THEREFORE,** in consideration of such employment and the mutual covenants and promises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive agree as follows:

Section 1.        Employment. The Company hereby agrees to or offers to employ the Executive as the Chief Executive Officer (the "Position") and the Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.

Section 2.        Term. The term of employment under this Agreement shall begin on January 1, 2021 and continue until December 31, 2021 (the "Term").

Section 3.        Duties. The Executive shall serve in the Position and shall devote all of his full business time and his full skill and attention to the performance of the duties to be performed by him hereunder and to the performance of any other duties that may be assigned to his reports. The Executive will use his best efforts to promote the interests of the Company and the Group.

Section 4.        Salary Compensation. In consideration of the services rendered by the Executive under this Agreement, the Company shall pay the Executive a base salary (the "Base Salary") specified in Schedule 1 attached, subject to the approval of the Board of the Directors, as required. The Base Salary shall be paid in such installments and at such times as the Company pays its regularly salaried executive employees. The Base Salary will generally be subject to an annual review by the Company. The Company may adjust the Base Salary from time to time in its sole discretion, subject to the approval of the Board of Directors.

Section 5.        Bonus Compensation. The Executive shall be entitled to receive a discretionary bonus (the "Bonus Compensation") as the Company may determine from time to time in its sole discretion, subject to the approval of the Board of Directors as required. For the avoidance of doubt, the Company reserves the right, at its absolute discretion, to amend, vary or terminate any bonus scheme from time to time, without compensation to the Executive. Bonus Compensation, if earned, is typically paid to participants by March of the year following the annual performance period. In order to be eligible for the Bonus Compensation in any fiscal year, the Executive must be employed in good standing by the Company as of the date that may be specified by the bonus scheme rules. The payment of any Bonus Compensation will be subject to the bonus scheme rules in place. Further and conditions regarding the Bonus Compensation are set forth in the attached Schedule 1. No Long Term Incentives will be available to The Executive during the term of this employment agreement.

Section 6.        Company Benefits. Subject to applicable eligibility requirements, the Executive will be entitled to participate in each pension, insurance, hospitalization and any other plan effective generally with respect to employees of the Company, in accordance with the terms of such plan, without restriction or limitation by reason of this Agreement, provided that such participation does not conflict with and applicable Group benefits program participation under Section 7, below. Subject to future plan modifications and subject to the specific terms of each plan, the Executive's benefit plan participation is summarized in Schedule 1, attached. The Company reserves the right to modify or terminate such plan(s) from time to time in its sole discretion.



Section 7.        Group Benefits. Subject to applicable eligibility requirements, the Executive will be entitled to participate in benefit plans of the Group to the extent that such plans by their terms are applicable to Group Company employees who have achieved the level of authority, responsibility and compensation enjoyed by the Executive, including, as applicable, Group bonus and pension plans. Subject to future plan modifications and subject to the specific terms of each plan, the Executive's Group benefit plan participation is summarized in Schedule 1, attached. The Company and the Group reserve the right to modify or terminate such plan(s) from time to time in their sole discretion.

Section 8.        Vacation. Subject to future modifications of the Company's vacation policy, and subject to the terms of such policy, the Executive's current vacation entitlement is specified in Schedule 1, attached. All vacation days, if applicable, will be at full pay and may be taken at the Executive's discretion, upon agreement with the individual to whom the Executive reports, and subject to the business and management needs of the Company. Accrued but unused vacation will be paid to the Executive upon termination of employment only if so required by state law. Accrued vacation days which are not used by the end of the calendar year may not be rolled-over into the next calendar year, and will be forfeited as of January 1 of the next calendar year.

Section 9.        Reimbursement of Expenses. The Company shall reimburse the Executive for all reasonable expenses actually incurred by the Executive in connection with the business affairs of the Company and the performance of the Executive's duties hereunder. The Executive shall comply with such reasonable limitations and reporting requirements with respect to such expenses as the Board may establish from time to time.

Section 10.        Termination. This Agreement and Executive's employment may be terminated as follows:

Section 10.01. By The Company for Cause. This Agreement and Executive's employment may be terminated by the Company for Cause (as defined below) at any time, effective upon written notice to the Executive, and the Executive shall not be entitled to receive compensation or other benefits for any period after termination for Cause, except as otherwise provided by law. Termination for Cause requires no advance notice and no severance pay. For purposes hereof, the term "Cause" shall mean that the Company, by its President or Board, has determined that any one or more of the following has occurred:

(a)        the Executive shall have been convicted of, or shall have pleaded guilty or nolo contendere to, any felony or a crime involving moral turpitude;

(b)        the Executive shall have failed or refused to perform his duties hereunder, it being understood that the Company's failure to achieve its business plan or projections shall not itself be considered a failure or refusal to perform duties;

(c)        the Executive shall have breached any provision of Section 11, 12 or 14 hereof;

(d)        the Executive shall have engaged in any fraud, embezzlement, misappropriation of funds, breach of fiduciary duty or other act of dishonesty against the Company or its customers;

(e)        the Executive shall have engaged in the habitual neglect of, or habitual negligence in carrying out, his duties under this Agreement; or

(f)        the Executive's repeated and intemperate use of alcohol or illegal drugs after written notice from the President or Board that such use, if continued, would result in the termination of employment.

Section 10.02. Termination by the Company Without Cause. This Agreement and Executive's employment may be terminated without Cause, for any reason whatsoever, in the sole discretion of the Company, upon written notice to the Executive. If Executive is terminated by the Company without Cause, Executive shall be entitled to receive Severance Pay and benefits outlined under Schedule 1 through salary

continuation for the period set forth in Schedule 1 attached, at the Executive's then current Base Salary, less customary payroll deductions and any outstanding obligations owed by the Executive to the Company ("Severance Pay"). Such Severance Pay shall be payable in accordance with the Company's usual payroll procedures. Such Severance Pay is expressly conditioned upon receipt by the Company of a full and unconditional release from Executive of any and all liability in the form of Exhibit A hereto and expiration of any period of revocation specified therein, and upon the Executive's compliance with all obligations set forth in this Agreement, including those set forth in Section 12.

Section 10.03. By the Executive Voluntarily. Executive may terminate this Agreement and/or his employment by providing written notice to the Company as required in Schedule 1 attached. Executive shall continue to perform his duties under this Agreement until the end of such notice period, unless the Company directs Executive to discontinue all or part of such duties before the end of such period, in which case Executive shall follow such direction. Executive shall arrange for the reasonable transition of his responsibilities. In the event Executive provides Company with written notice of termination of his employment, Company may, at its option, immediately terminate this Agreement and Executive's employment, upon written notice to Executive, in which case no further compensation or benefits shall be due or paid to Executive. Executive will not be entitled to severance pay if the Executive voluntarily resigns from their position.

Section 10.04. Death. This Agreement and Executive's Employment shall terminate upon Executive's death, effective on the date of death, except that the Company shall continue to pay Employee's Base Salary to his estate or other legal representative through the last day of the month in which his death occurs.

Section 10.05. Permanent Disability. In the event of any physical or mental disability or incapacity of the Executive rendering the Executive unable to perform the essential functions of his Position with or without reasonable accommodation for a period of at least one hundred twenty (120) consecutive days and the further determination that such disability is permanent, this Agreement and the Executive's employment shall terminate automatically, to the extent permitted by law. Any determination of disability shall be made by the Board, or its designee, in consultation with a qualified physician or physicians selected by the Board. The failure of the Executive to submit to a reasonable examination by such physician or physicians shall estop any objection by the Executive to the determination of disability by the Board. Upon such termination, Executive shall be entitled to receive his Base Salary through the date of termination, minus any disability insurance payments received by Executive.

Section 10.06. No Other Benefits. Except as specifically provided in this Agreement, the Executive shall not be entitled to any compensation, severance or other benefits from the Company, the Group or any of its subsidiaries or affiliates upon the termination of this Agreement for any reason whatsoever.

Section 11.    Proprietary Information: Inventions.

Section 11.01 Proprietary Information. The Company hereby agrees to provide Executive access to the Company's confidential, trade secret and proprietary information, including but not limited to information:

(a)    of a technical nature, such as, but not limited to, methods, know-how, formulae, compositions, drawings, designs, blueprints, specifications, compounds, processes, operating instructions or controls, layouts, machines, discoveries, inventions, computer programs and similar items;

(b)    of a business nature, such as, but not limited to, information about current or past personnel or personnel plans, sales or current or prospective customers, information about purchasing or current or prospective vendors or suppliers, information about pricing, prices, costs or profits and information about markets, current and future plans and strategies, product strengths and weaknesses and similar items; or

(c)    pertaining to future developments, such as, but not limited to, research and development, new product ideas of developments or future manufacturing, marketing or merchandising plans, ideas or strategies, and trade secrets, all of which are confidential and may be proprietary to the Company, the Group, or any of their subsidiaries or affiliates.

Such information shall hereinafter be called "Confidential Information" and shall include any and all items enumerated in the preceding sentence and coming within the scope of the business of the Company or any of their subsidiaries or affiliates to which the Executive may have access, whether conceived or developed by others or by the Executive alone or with others during the period of his service to the Company, whether or not conceived or developed during regular working hours. Confidential Information shall not include any records, data or information which are in the public domain during the period of service of the Executive provided the same are not in the public domain as a consequence of disclosure directly or indirectly by the Executive in violation of this Agreement.

Section 11.02. Fiduciary Obligations. The Executive agrees that Confidential Information is of critical importance to the Company and a violation of this Section 11.02 and/or Section 11.03 would seriously and irreparably impair and damage the Company's and/or their affiliates' or subsidiaries' business ("Business"). The Executive hereby agrees that he shall keep all Confidential Information in a fiduciary capacity for the sole benefit of the Company.

Section 11.03. Non-Use and Non-Disclosure. The Executive further agrees that he shall not, during the Term of this Agreement or at any time thereafter:

(a)     disclose, directly or indirectly, any Confidential Information to any person other than: the Company, the Group, or authorized employees thereof at the time of such disclosure, or such other persons to whom the Executive has been specifically instructed to make disclosure by the Board, and in all such cases only to the extent required in the course of the Executive's service to the Company or the Group; or

(b)     use any Confidential Information, directly or indirectly, for his own benefit or for the benefit of any other person or entity. At the termination of his employment, the Executive shall deliver to the Company all notes, letters, documents and records (in hardcopy and electronic formats) which may contain Confidential Information which are then in his possession or control and shall destroy any and all copies and summaries thereof.

Section 11.04. Assignment of Inventions. The Executive agrees to assign and transfer to the Company or its designee, without any separate remuneration or compensation, his entire right, title and interest in and to all Inventions in the Field (as defined below), together with all United States and foreign rights with respect thereto, and at the Company's expense to execute and deliver all appropriate patent and copyright applications for securing United States and foreign patents and copyrights on Inventions in the Field and to perform all lawful acts, including giving testimony, and to execute and deliver all such instruments that may be necessary or proper to vest all such Inventions in the Field and patents and copyrights with respect thereto in the Company, and to assist the Company in the prosecution or defense of any interference which may be declared involving any of said patent applications, patents, copyright applications or copyrights. For the purposes of this Agreement, the words "Inventions in the Field" shall include any discovery, process, design, development, improvement, application, technique, writing, or invention, whether patentable or copyrightable or not and whether reduced to practice or not, conceived or made by the Executive, individually or jointly with others (whether on or off the Company's premises or during or after normal working hours) while in the employ of the Company and which was or is directly or indirectly related to the business of the Company, the Group, or any of its subsidiaries or affiliates, or which resulted or results from or was suggested by any work performed by any employee or agent thereof during the Term of this Agreement or for one (1) year after termination of this Agreement for any reason. The Executive understands that he is not conveying rights in inventions he made prior to working for the Company which are identified in Exhibit B hereto.

Section 12.     Restrictions on Activities of the Executive.

Section 12.01. Non-Competition/Non-Solicitation:

(a)     During the Executive's employment by the Company, and if the Company terminates Executive for Cause under Section 10.02, then, for one (1) year after his last day of

employment, the Executive shall not, directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, consultant, independent contractor, or in any other capacity whatsoever:

(i)      engage in, or have a financial interest in, any business which is competitive, directly or indirectly, with the Business anywhere within the United States;

(ii)     contact, recruit, solicit or induce, or attempt to contact, recruit, solicit or induce, any employee, consultant, agent, director or officer of the Company, to terminate his or her employment with, or otherwise cease any relationship with, the Company;

(iii)    participate, directly or indirectly, in the hiring of any employee, consultant, agent, director or officer of the Company on Executive's behalf or on behalf of any other person, business, or entity; or

(iv)     contact, solicit, divert, take away, or attempt to contact, solicit, divert or take away, any clients, customers or accounts, or prospective clients, customers or accounts, of the Company or the Group, or any of the Company's or the Group's business with such clients, customers or accounts except as agreed upon in writing signed by a duly authorized officer of the Company.

(b)      If Executive is terminated by the Company without Cause pursuant to Section 10.03, or if the Executive terminates his employment voluntarily under Section 10.04 the restrictions in Section 12.01(a) (i)-(iv) shall be binding on the Executive for the Non-Compete Period as set forth on Schedule 1.

Notwithstanding the foregoing, nothing in Section 12.01(a)(i) or (b) shall prohibit the Executive from working for a business which is competitive with a business of the Company, if such competitive business does not provide products or services which are competitive, in whole or in part, with the products or services offered by the business unit(s) of the Company in which Executive was employed during any part of his tenure with the Company, subject to Executive's obligation hereunder and pursuant to the common law not to use or disclose Confidential Information.

(c)      Since the Company and the Group conduct business throughout the United States, the geographic scope of the foregoing restrictions shall be, to the extent permitted by applicable laws, the United States.

(d)      If any restriction set forth in this Section 12 is found by any court to be unenforceable because it is overbroad in any manner, such restriction shall be interpreted to extend only over the maximum period of time, range of activities, or geographic area which the court finds to be reasonable and enforceable.

(e)      As used in this agreement the term "client," "customer," or "accounts" shall include:

(i)      any person or entity that is a client, members, customer, partners, sponsor, affiliate, or account of the Company on the date hereof or becomes a client, customer, sponsor, affiliate or account of the Company during the one (1) year period following the Executive's termination;

(ii)     any person or entity that was a client, customer, sponsor, affiliate, or account of the Company at any time during the (2) two-year period preceding the date of the Executive's termination; and

(iii)    any prospective client, members, customer, partners, sponsor, affiliate, or account to whom the Company has made a presentation (or similar offering of services) within a period of 180 days preceding the date of the termination of the Executive.

(f)      The Executive acknowledges that the restrictions contained in this Section 12 are necessary for the protection of the Business, Confidential Information, and goodwill of the Company and are considered by the Executive to be reasonable for such purpose.

(g)    A competing business under this Section is intended to be and is defined as any real estate association that predominantly targets the LGBTQ+ community.

Section 13.    Acknowledgments. The Executive acknowledges and agrees:

(a)    that, during and as a result of his employment by the Company, the Company will train him in the Business and he will acquire experience, skills and knowledge related to the Business;

(b)    that the Company depends upon its goodwill, which it will entrust to the Executive during the term of his employment by the Company by affording the Executive the opportunity to become acquainted with the clients, customers, accounts, prospects, suppliers, licensees, franchisors and franchisees of the Company, to establish business relationships with them and to have access to records detailing their business activities with the Company;

(b)    that the Executive will be employed in a capacity in which the Executive will become familiar with Confidential Information; and

(c)    that the Executive's responsibilities, duties, position, compensation, title and/or other terms and conditions of employment may change from time to time or he may have a break in service or employment with the Company and, notwithstanding any change in any terms and conditions of employment or a break in service or employment, this Agreement shall remain in full force and effect, including, without limitation, Sections 11, 12 and 14 hereof.

Section 14. Non-Disparagement. During the Executive's employment and at all times thereafter, Executive will not make any disparaging statements concerning the Company or any of their affiliates, or any of their respective officers, managers, employees or products, that could injure, impair or damage any business relationship between the Company or any of their affiliates and any of their respective officers, managers or employees, on the one hand; and any of their suppliers, vendors, representatives or customers, or prospective customers, on the other.

Section 15. Severable Provisions. The provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provision. In the event that a court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable in whole or in part because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

Section 16.    Notices.  All notices hereunder, to be effective, shall be in writing and shall be delivered by hand or mailed by certified mail, postage and fees prepaid, to the Company at the address set forth above, or to the Executive at the address set forth above, or to such other address as a party may notify the other pursuant to a notice given in accordance with this Section 16.

Section 17.    Legal Fees and Expenses. The prevailing party of any legal action to enforce the terms of this Agreement shall be entitled to recover reasonable costs and expenses, including attorneys' fees.

Section 18. Code Section 409A. The provisions of this Agreement are intended and shall be interpreted and administered so as to not result in the imposition of additional tax or interest under Section 409A of the Internal Revenue Code where applicable. Without limiting the foregoing, this Agreement shall not be amended in a manner so as to result in the imposition of such tax or interest, any reference to "termination of employment" or similar term shall mean an event that constitutes a "separation from service" within the meaning of Section 409A, any reimbursement of expenses shall occur no later than the end of the calendar year following the calendar year in which the expense is incurred (or such earlier date as applies under the Company's business expense reimbursement policy), and if at separation from service the Participant is considered a Specified Employee within the meaning of said Section 409A, then any payments hereunder that are

nonqualified deferred compensation within the meaning of said Section 409A that are to be made upon separation from service shall not commence earlier than six (6) months after the date of such separation from service, and any such amounts that would otherwise be paid to the Participant within the first six (6) months following the separation from service shall be accumulated and paid to the Participant in a lump sum six (6) months and one day following the separation from service (or if the Participant dies during such (6) six-month period, as soon as practical following the date of death).

Section 19.    Property.

Section 19.01 Property of Others. Executive represents that his performance under this Agreement does not and will not breach any agreement to keep in confidence confidential information or trade secrets, if any, acquired by Executive in confidence prior to this Agreement. There are no agreements, written or oral, conveying rights in any such information. Executive represents, as part of the consideration for entering into this Agreement, that he has not brought and will not bring to the Company or use in the performance of his responsibilities at the Company any equipment, supplies, facility or trade secret or confidential information of any current or former employer or organization with which he provided services which are not generally available to the public, unless he has obtained written authorization for their possession and use.

Section 19.02. Property of Company. Executive agrees that all agreements, memoranda, notes, records, drawings, manuals, programs, codes, procedures, formulas, computers, PDAs, and any other materials belonging to the Company or the Group concerning, without limitation:

(a)    any process or product designed, programmed, manufactured, developed, modified, investigated or considered by the Company;

(b)    any method of doing business by the Company;

(c)    any customer or employee of the Company; or

(d)    any copyrights, programs, designs, codes or other Confidential information belonging to the Company, or any of its customers,

are and shall be the exclusive property of the Company and shall be delivered, along with all copies thereof, to the Company upon termination of the Executive's employment or at any other time upon request.

Section 20.    Miscellaneous.

Section 20.01. Modification. This Agreement constitutes the entire Agreement between the parties hereto with regard to the subject matter hereof, superseding all prior understandings and agreements, including without limitation prior employment agreements, whether written or oral. This Agreement may not be amended or revised except by a writing signed by the parties.

Section 20.02. Assignment and Transfer. This Agreement shall not be terminated by the merger or consolidation of the Company with any corporate or other entity or by the transfer of all or substantially all of the assets of the Company to any other person, corporation, firm or entity. The provisions of this Agreement shall be binding on and shall inure to the benefit of any such successor in interest to the Company. Neither this Agreement nor any of the rights, duties or obligations of the Executive shall be assignable by the Executive, nor shall any of the payments required or permitted to be made to the Executive by this Agreement be encumbered, transferred or in any way anticipated.

Section 20.03. Captions. Captions herein have been inserted solely for the convenience of reference and in no way define, limit or describe the scope or substance of any provision of this Agreement.

Section 20.04. Governing Law. This Agreement shall be construed under and enforced in accordance with the laws of Minnesota, notwithstanding the application of any conflicts of laws rules to the contrary.

Section 20.05. <u>Survival.</u> The provisions of Sections 10 through 20 of this Agreement shall survive termination of this Agreement and/or the termination of Executive's employment by the Company. This Agreement shall be deemed to have been drafted by both parties and no inference shall be drawn in favor or against any party as to the interpretation of this Agreement.

Section 20.06. <u>Automatic Renewal</u>. Upon the expiration of the original term or any renewal term of employment, Executive's employment shall be automatically renewed for a one (1) year period unless the notice provisions of Section 10.03 or Section 10.04 are invoked and properly executed or another contract was negotiated by the parties. During any renewal term of employment, the terms, conditions, and provisions set forth in this Agreement shall remain in effect unless modified by the applicable contract provisions.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the day and year first above written.

Section 21. <u>Amendment and Restatement.</u> This Agreement shall amend and restate in its entirety the Prior Agreement such that the Prior Agreement is of no further force or effect following the date of this Agreement.

**LGBTQ+ Real Estate Alliance (COMPANY)**

By: _____

Name:_____

Title:_____

Date: _____

**Ryan Weyandt (EXECUTIVE)**

By: _____

Date: Feb 2, 2021 _____

## EXHIBIT A

### GENERAL RELEASE

General Release of Company. *The following is a General Release, which means that by signing this document, you are waiving and giving up all claims you may have against the Company Released Parties, as defined below.*

I, for myself and my heirs, legal representatives, beneficiaries, assigns and successors in interest, hereby knowingly and voluntarily release the LGBTQ+ Real Estate Alliance and each of their affiliated and related companies, and each of their successors, assigns, former or current shareholders, officers, directors, employees, agents, insurers, attorneys and representatives ("Company Released Parties") from any and all causes of action, in law or equity, whether known or unknown, I now have, may have or ever had, from the beginning of the world to this date, including, without limitation, [any claims under the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq.;]* claims for breach of contract  or based on tort or common law; claims for **discrimination and wrongful termination, and any other statutory, regulatory or common law causes of action under federal, state, local or human rights law, ("the Released Claims"). I** *hereby acknowledge and understand* that this is a General Release.

[ADEA Disclosures/Revocation. I am advised that I have twenty-one (21) days to consider this General Release and that I should consult with an attorney prior to executing it. For a period of seven (7) days after executing this General Release, I may revoke this General Release by providing written notice of such revocation to the Board Chair at LGBTQ+ Real Estate Alliance (the "Company") of PO Box 18491 West St. Paul, MN 55118-5511 and this General Release shall not become effective or enforceable until said *(7)* seven-day period has expired.]

[Multiple Terminations] I am advised that I have forty-five (45) days to consider this General Release and that I should consult with an attorney prior to executing it. For a period of seven *(7)* days after executing this General Release, I may revoke this General Release by providing written notice of such revocation  to the Board Chair at LGBTQ+ Real Estate Alliance (the "Company") of PO Box 18491 West St. Paul, MN 55118-5511 and this General Release shall not become effective or enforceable until said *(7)* seven-day  period has expired.]

Acknowledgment. By signing this agreement, I acknowledge and agree that I understand the meaning of this General Release and that I freely and voluntarily enter into it.  I agree that no fact, evidence, event,  or transaction, whether known or unknown, shall affect in any manner the final and unconditional nature of the agreements and releases set forth  herein.

AGREED TO AND EXECUTED UNDER SEAL THIS_____day of_____, 20_.

_____

*[NOTE: The bracketed language above concerning ADEA disclosures/revocation is only necessary if the employee is over 40 years of age.]*

**EXHIBIT B**

**DISCLOSURE OF INFORMATION REQUIRED BY SECTION 11.04.**

The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company, but neither published or filed in the United States Patent and Trademark Office:

○ ____ No inventions or improvements.

◉ ____ See below.

First Time Homebuyer's Guide (print and digital), Homebuyer education course curriculum (not Realtor CE).
_____
_____
_____
_____
_____
_____

____ Additional sheets attached.

By:_____

Date: Feb 2, 2021 _____

Ryan
Weyandt

## SCHEDULE 1

## SUMMARY OF PAY AND BENEFITS*

**Position Title: Chief Executive Officer ("CEO")**

1.  Base Salary 2021

    USD $115,000.00 per year effective January 1, 2021. Reviewed annually in accordance with the Company's salary review process.

    Payroll Calendar for:

    2021: https://www.gsa.gov/cdnstatic/GSA_Payroll_Calendar2021.pdf
    2022: https://www.gsa.gov/cdnstatic/GSA_Payroll_Calendar_2022.pdf

2.  Vacation/Holiday Entitlement

    Each of the following terms is inclusive of the years stated.

    For years 1 and 2 of employment: two weeks of vacation.
    For years 3 through 5: three weeks of vacation.
    For years 6 through 10: four weeks of vacation.
    For years 11 and longer: six weeks of vacation.

    The Company will observe Federal holidays. Compensation will not be above and/or beyond the base salary offered.

3.  Company Benefits Plans

    Not applicable at this time.

4.  Annual Bonus/Short Term Incentive

    The payment of a discretionary bonus of no less than three percent (3%) of the remaining net earnings in the organization's operating accounts at the end of the fiscal year. Payment of said discretionary bonus shall be paid by the end of the first quarter following the end of the fiscal year. Payment of any discretionary bonus will be decided by the Board Chairperson and the Treasurer each taking into consideration the following financial conditions:

    a)  The financial stability of the operating account to meet its' financial obligations during the current year after any distribution of the discretionary bonus;
    b)  The distribution of the discretionary bonus will not in any way hamper the organization's financial obligation and/or create a financial hardship;
    c)  The distribution of the discretionary bonus will not negatively impact the organization's ability to maintain its 501c6 status, good standing with the IRS, and/or otherwise maintain the financial health of the organization;

    Note: *It is well established that it takes approximately three (3) years for a new non-profit organization to establish credit with Dunn & Bradstreet to have a credit-line extended. In the absence of a credit line, any potential discretionary bonus that could draw the operating account into a negative balance will be considered detrimental to the organization's health and will not be paid.

5.  Long Term Incentive Plan

    Not applicable at this time.

6.  Salary Continuation Per Section 10.03

    One (1) Month per year of service **only after** Executive has worked for the organization for one (1) year, up to a maximum of five (5) months of severance payments.

7.  Voluntary Termination Notice Per Section 10.04
    Two (2) Months' notice required in years 1 through 5 of Executive's employment; three (3) months' notice thereafter.

8.  Non-Compete Period Per Section 12.01

    Twelve (12) Months.

**\* All compensation and benefits are subject to the terms of the relevant plan documents, which may be amended or terminated at any time upon action by the Board of Directors.**

# Employment Contract__Ryan Weyandt_Final

Final Audit Report                                                    2021-02-03

| | |
|---|---|
| Created: | 2021-02-02 |
| By: | ROLF FIEBIGER (rolf@fiebigerlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAQ5aiOTwLN5sOSPNeL9SQTt2A9n9hVo3E |

## "Employment Contract__Ryan Weyandt_Final" History

Document created by ROLF FIEBIGER (rolf@fiebigerlaw.com)
2021-02-02 - 3:45:44 PM GMT- IP address: 50.249.103.250

Document emailed to Ryan A. H. Weyandt (ryan@realestatealliance.org) for signature
2021-02-02 - 3:47:14 PM GMT

Email viewed by Ryan A. H. Weyandt (ryan@realestatealliance.org)
2021-02-02 - 5:13:06 PM GMT- IP address: 24.118.183.129

Document e-signed by Ryan A. H. Weyandt (ryan@realestatealliance.org)
Signature Date: 2021-02-03 - 0:32:43 AM GMT - Time Source: server- IP address: 24.118.183.129

Agreement completed.
2021-02-03 - 0:32:43 AM GMT

Adobe Sign